## Supreme Court of Pennsylvania.

### NISI PRIUS.

**1809.**

*Monday,*
*February 27.*

WILCOCKS and others *against* The UNION INSURANCE COMPANY.

Any trick, cheat, or fraud, and any *crime* or *wilful breach of law,* committed by the master to the prejudice of his owners, is barratry.

If the policy contains a warranty of neutral property, and at the same time, the usual agreement by the underwriter to answer for the barratry of the master and mariners, the warranty implies, that the neutral character shall not be forfeited by any acts of the insured or their agents, *except only by such as may amount to barratry.*

The crew of a neutral vessel, captured and sent in for adjudication, are not obliged to navigate her. It is the duty of the captors to put a sufficient force of their own on board, and if they neglect to do it, they do

THIS was an action of covenant upon a policy for 20,000 dollars on goods in the brig *Pennsylvania,* on a voyage from *Philadelphia* to *Smyrna,* and from thence to *Canton* and home, with liberty after leaving *Smyrna* to touch and trade at *Trieste,* or one other port in the *Adriatic.* Warranted *American* property, proof whereof if required, to be made in *Pennsylvania* only.

The declaration contained two counts; 1. for a loss by capture; 2. for a loss by barratry; and the cause was now tried before the Chief Justice and a special jury, *C. J. Ingersoll* and *Hopkinson* being of counsel with the plaintiffs, and *Dallas* and *Rawle* with the defendants.

The controversy involved a great mass of testimony, and several points of law of considerable novelty and importance; but it is unnecessary to give an outline in this place either of the evidence or the law, as both are condensed with great precision in the following charge.

TILGHMAN C. J. This action is for the recovery of 20,000 dollars, underwritten by the defendants upon goods in the brig *Pennsylvania,* on a voyage from *Philadelphia* to *Smyrna,* &c.; warranted *American* property, proof whereof, if required, to be made in *Pennsylvania* only.

The plaintiffs' declaration contains two counts. In the *first* they declare on a loss by capture; in the *second* on a loss by the barratry of the captain and mariners.

The brig sailed on her voyage from *Philadelphia* to *Smyrna,* where she arrived safe, and proceeded from thence to *Trieste,* where she took in a cargo consisting principally of quicksilver.

not take sufficient possession, and the neutrals may consider her as abandoned to them. But if an insufficient force is put on board in consequence of a promise by the neutral crew to navigate her to the destined port, they are bound by their promise, and must be considered for the purpose agreed on, as the hands of the captors. If in violation of their promise, they take the vessel into their own hands, it is an unlawful rescue, which is an act of barratry.

The adventure of the master, captain *Macpherson*, amounted to sixteen or seventeen hundred dollars. The cargo was wholly the property of the plaintiffs, native citizens of *Pennsylvania*. The brig, manned by fourteen hands, including the captain, sailed from *Trieste* on the 4th of *May* 1807, bound to *Canton*, and was proceeding on her voyage, when on the 13th *May*, not far from the strait of *Messina*, she was stopt by two privateers, a polacre and a xebec under *English* colours, who, after examining her papers, put two men and a boy on board of her, and ordered her for *Malta* for further examination. The name of one of these men was *Hardy*, a *British* subject, who was prizemaster; the other man was a *Maltese*. The brig then proceeded, until she doubled Cape *Passaro* in a course proper either for *Malta* or *Canton*. After doubling the cape, she altered her course, and steered down the *Mediterranean* for *Canton*. On the 16th of *May* another privateer under *English* colours, the *Grande Bretagne*, took possession of the *Pennsylvania*, and carried her into *Malta*. She was there libelled in the *British* court of vice-admiralty, and condemned on the 13th of July. The reason assigned by the judge for condemnation was, that she had been " rescued " by the captain and crew, from the hands or possession of the " first captors."

Thus far the facts are undisputed, and the defendants say, that they ought not to make good the loss, because it was occasioned solely by the improper conduct of the captain and crew; and that this conduct, though improper, did not amount to barratry. On the other hand the plaintiffs allege, that in fact there was no rescue, although the court of admiralty have decreed so; and that if there was a rescue, it was barratry, against which the defendants have insured.

The cause is thus divided into two points, the *first* of fact, the *second* of law. The jury will turn their attention first to the fact, and if they are of opinion that there was no rescue, their verdict on the *first* count, will be for the plaintiffs; but if they think there was a rescue, then for the defendants. On the *second* count, I will give them my opinion on the law respecting barratry.

I shall not enter into a minute detail of the evidence. But it will be proper to take notice of some leading facts, and to

make some remarks, with a view to assist the jury in their inquiry.

The plaintiffs' principal witnesses are captain *Macpherson* and *Vanvoorcs* the first mate. They agree very much in their testimony, the substance of which is to the following effect: that after the privateer had put *Hardy*, the *Maltese* and the boy, on board the *Pennsylvania*, the crew refused to work for the privateer. Captain *Macpherson* being informed of this, advised *Hardy* to hail one of the privateers, who was near, and ask for more hands. *Hardy* hailed repeatedly, but the privateer refused to send any more and went off. In this situation the *Pennsylvania* pursued her course, which answered either for *Malta* or *Canton*. Off the coast of *Sicily*, captain *Macpherson* proposed to *Hardy* to go into *Syracuse* where he might get hands to navigate the brig to *Malta*, or have her papers examined by the *British* consul or agent. *Hardy* at first declined this, but at length consented. They passed *Syracuse* while it was *Hardy's* watch, the captain being asleep below, and *Hardy* deceived the persons on deck, by telling them *Syracuse* was ahead. When the captain awoke and came on deck, he perceived the trick, and shewed some resentment. Not long after this, as they approached the dividing point, between the course for *Malta* and *Canton*, the crew declared that they would not work the brig to *Malta*, and *Hardy* knowing that he had no hands of his own sufficient to work her, determined voluntarily to deliver up the papers and the possession of the vessel to captain *Macpherson;* but it was agreed between them, that there should be some appearance of threats or force, in order to deceive the *Maltese*, who *Hardy* feared would do him some injury, if he saw that the brig was voluntarily surrendered. Accordingly some words passed, which had the appearance of threats; but in truth a voluntary surrender was made.

A different story is told by *Stockton* and Dr. *Kennedy*, the principal witnesses of the defendants. They say that while *Hardy* was hailing the privateer for more hands, the carpenter advised the crew to consent to navigate the brig, lest they should be removed on board the privateer, and thrown into prison in the first port they arrived at. That the crew approved of this advice, and consented to work the vessel to

*Malta;* whereupon *Hardy* told the privateer there was no occasion to send more hands. *Kennedy* represents the delivery of the papers by *Hardy* to captain *Macpherson*, to have been in consequence of a threat by the latter to take them by *force*, if they were not delivered to him. *Stockton* declares that captain *Macpherson*, when they came near the dividing point, mustered the crew, and asked them whether they were willing to work the brig *for him*, and being answered that they were, he ordered the man at the helm to keep her *west*, in consequence of which the course was immediately altered, and they stood down the *Mediterranean*.

I believe it will be a vain attempt, to try to reconcile all the testimony in this cause. There has been *perjury* on one side or other, and the jury must decide between them. They are the sole judges of the *character* of the witnesses. No direct evidence has been offered to impeach the character of any; but it has been remarked by counsel, that a strong imputation against the character of some of them, arises from a comparison between the evidence delivered at *Malta*, and in this court. The jury will make that comparison; and if it appears that *any* witness has deviated *now*, from what he swore at any other time, it will undoubtedly lessen his credibility. They will also consider the situation in which the several witnesses stand. If any of them appear to have either character or property at stake in this cause, they will not stand so fair as those who are perfectly indifferent. I cannot help remarking that it requires strong testimony to convince us, that a prizemaster with a very rich vessel under his care, should make a voluntary surrender of her when within a day's sail of his port. Such conduct is not easily accounted for, unless by supposing that the privateersman, knowing there was no legal ground for condemning the vessel, had intended from the beginning, to condemn her by fraud and perjury, and in pursuance of this plan *Hardy* gave her up, with a view of procuring a recapture by the first cruiser he should meet with, and then swearing to a rescue. If the proof of rescue, depended solely on the testimony of the privateersman, there might be good ground for supposing there was such a plan as I have mentioned; but what are we to say to the testimony of *Stockton* and Dr. *Kennedy?* The jury must weigh the whole evidence, and decide on it.

In speaking to this part of the cause, the *plaintiffs'* counsel raised some points of law, concerning which, they requested my opinion to the jury. What is the duty of the crew of a neutral vessel, captured and sent in for adjudication? And what kind of force does in law constitute a rescue?

As to the duty of the crew, they are *not obliged* to navigate the vessel; the captors therefore should take care to put sufficient force of their own on board. Should they send but a single hand, or so few, that it was manifestly impossible to work her, this would not be taking sufficient possession. In that case the neutrals are not obliged to submit their property and lives to the mercy of the winds and waves, and may lawfully consider her as abandoned to them, and act accordingly. But if a force insufficient to work the vessel is put on board by the captors, in consequence of the promise of the neutral crew, to navigate her to the destined port, they are bound by such promise, and must be considered, for the purpose agreed on, as the hands of the captors. If, in violation of their promise, they take the vessel into their own hands, I am of opinion that it is an unlawful rescue. As to the degree or kind of force, necessary to make a rescue, it is obvious that force is of two kinds, either actual or constructive. If captain *Macpherson* assumed the command of the crew, and without the consent of *Hardy*, ordered the helmsman to alter his course, and such order was obeyed, this was *actual force.* But there may be constructive force by *threats;* the threats however must be of such a nature, as might reasonably be supposed sufficient to intimidate a man of moderate firmness. It would require no very great threatening, to give cause of reasonable alarm to two or three resolute men, surrounded by fourteen, in the midst of the ocean.

Having said enough as to the facts in this case, I will now proceed to the second point, the law of barratry. But I must first say a few words concerning a point which I suggested to the consideration of the counsel, during the argument, in order to afford them an opportunity of satisfying a doubt of my own, and because consequences are involved in it, which may tend to shorten trials of this kind. The underwriters have expressly insured against barratry. The insured has warranted that the property is neutral, and by construction

of law, that it shall be so conducted, as to *remain* neutral, during the voyage. Here is a conflict between the covenant of the insurers, and the warranty of the assured. What is the effect of it? The decree of the foreign court of admiralty is *conclusive*, except as to those matters, concerning which the insured has made a *warranty*, and has reserved to himself the right of proving his warranty in this court. It follows, that if he has *not* warranted against *barratry*, and the foreign sentence adjudges that barratry has been committed, no evidence except by consent could have been given in this cause, to contradict the decree of the court of *Malta*. I will now consider the effect of the collision between the covenant to insure against barratry, and the warranty of *American* property. This warranty, in strict construction, would only import, that the property belonged to a neutral person. But it has been extended much further. It is understood that the vessel should be furnished with all those documents, which are the proof of neutrality, and that no act should be done on the part of the insured to forfeit the neutral character. To carry this idea to its full extent, it would include the acts of the captain, who is the agent of the insured. But considering the express insurance against barratry, I think it, taking the whole instrument together, most reasonable so to construe it, as to leave the insurance against barratry in full force; especially as the same construction has been put on another warranty in the policy, *viz.* that the insurers shall be free from loss in consequence of seizure on account of illicit trade. It is understood, that if a loss arises in consequence of illicit trade of the *captain*, amounting to *barratry*, the insurers are liable. On this principle, the warranty will imply, that as to all acts to be done by the insured themselves, or by their agents, except only such as amount to barratry, the neutral character, shall be preserved.

I will now consider what is barratry. As it is an act committed by the master, or mariners, over whom the insurers have no control, it has often been wondered, and it is indeed cause of wonder, that it should still keep its place in policies of insurance. Many questions have arisen on it, and many cases have been cited on the argument of this cause. I have examined all the *English* cases, (as well as the short intervals

APPENDIX.

WILCOCKS
et al.
*v.*
UNION INS.
Co.

between the sittings of the court would permit) from *Knight* v. *Cambridge*, in the 9th of *Geo.* II, to *Earl &c.* v. *Rowcroft* in the 47th *George* III, and the cases in our own country from *Hood's executors* v. *Nesbitt*, in our supreme court in the year 1792, to *Doederer* v. *The Delaware Insurance Company*, in the Circuit Court of the *United States*, *April* 1807. I will give what appears to be the result of these cases, without undertaking to give a definition of barratry; for such is the imperfection of language, that many disputes arise from the general expressions employed in *definitions.* The result then of the cases appears to me to establish two principles. 1st, That any trick, cheat, or fraud, practised by the captain, to the prejudice of his owners, is barratry. 2d, That any *crime* committed by the master, to the prejudice of his owners, is barratry. In those cases, where the point turns on *the fraud*, or *cheating* of the captain, it is always important to ascertain whether his conduct promoted his own interest; for if it did in any considerable degree, and especially if his interest was in exclusion of his owners, the presumption is violent that his intent was fraudulent. The hasty perusal of these cases, has sometimes induced an opinion, that there could be no barratry where the captain did not act from motives of *self-interest.* But this test will not be sufficient to decide those cases which arise on the second branch of barratry, from *crime.* What is crime? As applied to the present purpose I will call it " a wilful breach of law, to the prejudice of the " owners." Now in this point of view, it is of no consequence, whether the captain has an interest of his own or not. It must be considered as an implied trust between him and his owners, that he will not without their orders, break a law, which subjects their property to forfeiture. It is understood to have been decided, that leaving a port without paying duties, and thereby rendering the ship liable to confiscation, is barratry. It has been decided, that it was barratry for the captain, to make a cruise in which he took a prize, without a lawful letter of marque, although he libelled the prize in the name of his owners, as well as his own; so if he carries on a trade forbidden by law, although his intention was to make a profit for his owners.

I understood one of the defendants' counsel, (Mr. *Dallas*)

to admit that a violation of the law of this state would be barratry. In this respect I do not see any material difference between a law of our own state, and a law of nations. We consider the law of nations as part of our law. It was so determined in the case of *De Longchamps*, 1 *Dall.* 111., who was indicted, convicted, and punished, for a breach of the law of nations, committed in the house of the *French* ambassador, in this city. We have the opinion of Judge *Buller*, that the act of a neutral master, which forfeits his neutrality, is barratry. It has not, I think, been contended by the defendants' counsel, that a *rescue* is not unlawful. On that point I agree with the opinion of Judge *Washington*, in *Doederer* v. *The Delaware Insurance Company*, where he thus expresses himself; " that the attempt to rescue the vessel, was unlawful, and " afforded a ground for condemnation, is proved by the opin-" ion of the best informed jurists, and has received the sanc-" tion of the common law courts, in a variety of instances;" he adds " that this doctrine was admitted by the counsel of " the assured." Upon the whole, my opinion is (formed indeed during the course of this trial, and therefore not so much to be relied on, as if after an argument in bank) that if a rescue was committed, it was an act of barratry.

If therefore the jury should find for the defendants on the first count, my advice to them is to find for the plaintiffs on the second count. On the contrary, if they find for the plaintiffs on the first count, then, there having been no rescue, there was no barratry, and in that case the verdict on the second count must be for the defendants.

The jury found for the plaintiffs on the first count, and the defendants acquiesced in the verdict.