THE HELLIG OLAV.

(District Court, S. D. New York. September 17, 1921.)

No. 713.

Shipping ⊖141(1)—Failure to deliver cargo held due to restraint of princes.

A steamship bound for Copenhagen, with contraband cargo on board, was seized and taken to a British port, where the contraband was found, but was allowed to proceed to deliver her passengers and other cargo on an agreement by the agent of the steamship company to return the contraband cargo to England. On arrival at Copenhagen, it refused to deliver such cargo to the consignee and returned it to England on another vessel, where it was condemned by the prize court. *Held* that, in so carrying such cargo from and back to a British port, the company acted as agent of the British government, which did not lose its possession, and that the failure to make delivery to the consignee was due to restraint of princes within the exception of the bills of lading.

In Admiralty. Suit by the Sulzberger & Sons Company against the steamship Hellig Olav. Libel dismissed.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Charles R. Hickox and E. S. Murphy, both of New York City, of counsel), for libelant.

Burlingham, Veeder, Masten & Fearey, of New York City (Van Vechten Veeder and Roscoe H. Hupper, both of New York City, of counsel), for claimant.

AUGUSTUS N. HAND, District Judge. This is a libel by the owners of cargo who charge that the steamship Hellig Olav on arriving at her port of destination failed to deliver the cargo, but that it was brought back to England in another vessel of the same line, where it was condemned as prize. The cargo was oil, meat and lard, and was contraband. The vessel sailed from New York April 1, 1915, and on April 10, when about 70 miles west of Scotland, was stopped by a British cruiser, which required her to proceed to Kirkwall for inspection. There, on April 11th, British officers came aboard and took the ship's papers. On April 14th, a British officer returned the papers and told the master that the ship was free to proceed on her voyage. In the interval between her arrest and sailing from Kirkwall, the London ship's agent gave a guaranty on behalf of the owners that if the vessel was allowed to proceed the cargo would be returned to England as soon as possible. This course was taken to convenience the steamer and to avoid delay to passengers and other cargo which would have

⊖For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

attended unloading contraband merchandise at Kirkwall. The Hellig Olav proceeded to Copenhagen, unloaded her cargo, but refused to deliver the contraband cargo in question, though demand for delivery was duly made by the consignee, and the cargo was brought back to Newcastle, England, on the steamship Alexander, of the same line, where it was condemned as lawful prize. This suit is brought in rem for failure to deliver, and conversion of the cargo.

The libelant appeared in the British Prize Court and, after the Crown had put in its proof, withdrew its claim and admitted that the merchandise was contraband. The decree of Sir Samuel Evans, Judge of the Prize Court, was pronounced on June 20, 1916.

The master was not served with any notice of seizure of any cargo at Kirkwall, and did not know anything about the arrangement between the ship's agents and the Crown for the return to England of the contraband; but he did not have anything to do with the delivery of cargo. It was left at Copenhagen and afterwards returned by the company to England.

The bills of lading contained the provision that—

"The carrier shall not be liable for loss or damage occasioned * * * by arrest and restraint of princes, rulers or people."

The question involves an important but exceedingly narrow point of law as to just what constitutes a "restraint of princes." Decisions upon a state of facts similar to those presented in this case are strangely few. Indeed, I have been referred to none where the situation is absolutely identical.

Certainly there was a "restraint of princes" at Kirkwall, for the ship was boarded and the papers were taken for the purpose of ascertaining whether she carried contraband merchandise, and of bringing such merchandise into the Prize Court if it was found. The merchandise in suit was found, and it is not disputed that it was contraband. At the request of the ship's agent it was not unloaded at Kirkwall and taken before a Prize Court, but was allowed to be carried out of the jurisdiction upon the promise to bring it back. Was this treatment of the merchandise a release from actual or constructive control which terminated the restraint so that the carriage to Copenhagen was had under the bills of lading and subject to the obligation imposed by the terms of those documents requiring delivery to the consignees?

The guaranty relating to the contraband goods in question was given by the ship's agents at London to the Director of Trade Division, Admiralty War Staff, and was in the following language:

" * * * In consideration of your allowing this steamer to proceed to Norway and Copenhagen, we hereby guarantee that the goods specified * * * shall be returned to this country as soon as possible."

In my opinion the most reasonable interpretation of the dealings between the parties is that the steamship company acted as the agent of the British government to carry the contraband merchandise to Denmark and return it thence to England to await the action of a prize court. This is what was in fact done, and I can see no peril to commercial understandings and transactions involved in such a decision.

Where a vessel has been arrested and released with advice or direction to go, or not to go, to certain ports, it has been held that the restraint had ceased and the voyage was not broken up. King v. Delaware Ins. Co., 6 Cranch, 71, 3 L. Ed. 155; Richardson v. Marine Ins. Co., 6 Mass. 102, 4 Am. Dec. 92. In those cases, however, there was no attempt, as in the present suit, to retain an actual or constructive possession for the purpose of having a vessel or its cargo, adjudged a prize. In King v. Delaware Ins. Co., supra, there was no arrest to secure a prize, but a warning to an American vessel by a British vessel, after the unconditional release of the former, not to proceed to a French port. The warning was held by the Supreme Court to be based on a misunderstanding of the effect of British orders in Council, and not to constitute a restraint. In Richardson v. Marine Ins. Co., supra, an American vessel was boarded by a British privateer and advised to return home and not to proceed to Malaga, as the British orders in Council had declared a blockade of Spanish ports. There was no arrest of the ship, nor agreement on her part to carry out the advice of the privateer. It was held that the mere fear of loss was not a peril within the policy which justified the assured in abandoning the vessel as a total loss.

In King v. Delaware Ins. Co., supra, Chief Justice Marshall said:

"There did not, then, at the time the voyage was abandoned, exist, either in fact or in law, the restraint or detention, against which the underwriters insured. From fear, founded on misrepresentation, the voyage was broken up, and the vessel returned to her port of departure."

It is contended that the company was in this case under no control of Great Britain as to the contraband cargo after the vessel was allowed to proceed from Kirkwall, and that it returned the cargo quia timebat and not because of any restraint of princes. All that depends on whether the voyage was broken up so far as the cargo in question was concerned before the vessel left Kirkwall. In The Alexander, Fed. Cas. No. 164, it was urged that the capture had been abandoned because no prize crew, but only a single prize master, had been put on board while the vessel was navigated by the captain and crew. Mr. Justice Story said:

"It is true that the master and crew of a prize ship are not compellable to navigate her, but if they voluntarily engage so to do, it is a legal waiver of the prize crew; and the parties are bound by their engagement, and the capture stands absolute. Such was the express decision of Sir William Scott in The Resolution, 6 C. Rob. (Adm.) 13, a case which as to the fact of capture, strongly resembles that before the court. This doctrine has also been fully recognized in the courts of common law, and does not seem to admit of any reasonable doubt. Wilcocks v. Union Ins. Co., 2 Binn. 574. * * * What indeed is necessary to constitute a capture? In ordinary cases the fact admits no doubt, and in point of law, nothing more is necessary than an intention of capture, followed up by an actual or constructive possession of the property. Force and violence, or physical superiority are not required. It is sufficient if there be a deditio or submission on the one side and an asserted possession on the other."

This sentence of the Circuit Court for the District of Massachusetts was affirmed by the Supreme Court in an opinion written by Chief Justice Marshall. 8 Cranch, 169, 3 L. Ed. 524.

The Alexander and the case of Wilcocks v. Union Ins. Co., 2 Bin. (Pa.) 574, 4 Am. Dec. 480, are in my opinion sufficient authority to justify me in carrying out the clear intention of the parties. The manifest purpose was to preserve, and not to abandon, the prize and to employ the company owning the vessel as an agent of the British government to hold the contraband merchandise until it in due course became amenable to the process of a Prize Court. The fact that it was at one time in Denmark, a neutral country, is quite immaterial. If, as I find to be the fact, it was, when it reached Copenhagen, already a lawful prize in the constructive possession of the captors, it could apparently have been condemned by the British courts. Hudson v. Guestier, 4 Cranch, 293, 2 L. Ed. 625; The Henrick and Maria, 4 Rob. 35; Cheriot v. Foussat, 3 Bin. (Pa.) 257. The transshipment to England, because proceedings in the British court after the merchandise had been returned to that country were more usual and more acceptable to the captors, cannot alter the situation. The acts of the captors were consistent and nowhere showed an abandonment. There was consequently no obligation to deliver the cargo at Copenhagen and a fortiori no conversion.

The libel is dismissed, with costs.