### ALEXANDER, The.

[See Brown v. The Alexander McNeil, Case No. 1,988; Southern Bank v. Same, Id. 13,186; Coyne v. Same, Id. 3,312a.]

---

### Case No. 164.

### The ALEXANDER.

[1 Gall. 532.][1]

Circuit Court, D. Massachusetts. Oct. Term, 1813.[2]

Prize — Trading with Enemy after Declaration of War — Confiscation of Vessel—Evidence of Capture.

1. If, after a knowledge of the war, an American vessel go to an enemy port, and take in a cargo there, the vessel and cargo are liable to confiscation for a trading with the enemy. See The Mercurius, 1 C. Rob. [Adm.] 80; The Columbia. Id. 154; The Neptunus, 3 C. Rob. [Adm.] 173; The Alexander, 4 C. Rob. [Adm.] 93; The Exchange, 1 Edw. [Adm.] 39.

[See Caldwell v. Southern Exp. Co., Case No. 2,303.]

[1][Reported by John Gallison, Esq.]
[2][Affirmed by the supreme court in The Alexander, 8 Cranch, (12 U. S.) 169.]

2. What constitutes a capture. If there be an animus capiendi, and a submission on one side, and a possession on the other, it constitutes a capture, although no prize crew be put on board.

3. A prize crew not necessary to navigate a captured ship, so as to preserve the possession of the captors, if the captured crew agree to navigate her.

4. But the captured crew are not by law compelled to navigate her.

5. Where, on the original preparatory evidence, the fact of capture is admitted, further proof ought not to be admitted, to create doubts, as to the fact of capture.

6. Further proof is never allowed to a party, who shows himself in delicto.
[Cited in The Cuba, Case No. 3,457; The Lilla, Id. 8,348.]

7. The president's instruction of the 28th of August, 1812, did not protect from capture vessels coming from British ports with cargoes put on board long after a full knowledge of the war.

[8. Cited in The Revere, Case No. 11,716, as authority for dismissing a claim, and even for condemnation, where a ship sailed with false papers, as to her destination, and put in a false claim, supported by false testimony.]

[See The Joseph, 8 Cranch, (12 U. S.) 451; The Rapid, Id. 155; Jecker v. Montgomery, 18 How. (59 U. S.) 114; The Diana, Case No. 3,876; Caldwell v. Southern Exp. Co., Id. 2,303.]

[In admiralty. Libel, as prize, of the brig Alexander and cargo, (William S. Picket, master, John Welles and Samuel Welles, claimants.) The United States also interposed a claim to the vessel and cargo as forfeited under the nonimportation act. The district court condemned the property as forfeited to the United States. From its decree the captors and the claimants appeal. Decree of condemnation to captors, affirmed by supreme court. The Alexander, 8 Cranch, (12 U. S.) 169.]

Cummings & Sprague, for captors.
F. Blake and R. G. Amory, for claimants.
George Blake, for the United States.

Before STORY, Circuit Justice, and DAVIS, District Judge.

STORY, Circuit Justice. The brig Alexander and cargo, owned by Messrs. John and Samuel Welles, (who are American citizens,) was captured by the privateer America, John Kehew, commander, on the 2d of June, 1813, on the high seas, for an alleged illegal traffic with the enemy. From the preparatory evidence and papers, and the affidavit of the claimants, (which as to these facts does not seem controverted,) it appears, that the brig sailed from Boston, in December, 1811, on a voyage to Naples, where she safely arrived and took on board a cargo of brandy, wine, and cream of tartar, with which she sailed from Naples, on the 22d of June, 1812, having on board a British license to protect the same on a voyage to England. The claimants assert, that when the brig

sailed from Naples, it was the intention of the master to land his deck load of brandy at Gibraltar, and to proceed with the residue of the cargo directly to Boston, and that the British license was intended as a protection of the brig and cargo until they had passed the Straits of Gibraltar. The brig accordingly stopped at Gibraltar, discharged her deck load, and sailed for Boston with the remaining cargo. In the course of the voyage, about the 3d of August, the master received information of the war, and immediately, and with a view to avoid British capture, changed his course for England, and on the voyage thither, the vessel was captured by two British cruisers, carried into Cork, and, after a detention of seven months, was, on trial, finally restored. The cargo was unlivered and sold at Cork, and the vessel then proceeded in ballast to Liverpool, where an attempt was made to sell her, but without success. Mr. Samuel Welles (one of the claimants) being then in England, thereupon purchased, with the funds of the partnership, the present cargo, consisting wholly of British manufactures, with a view to withdraw these funds from Great Britain, and on the 9th of May, 1813, the brig with the said cargo on board, sailed from Liverpool, on a voyage to Boston, for which place she was steering at the time of the capture. The brig arrived in Boston harbor on the 5th of July, 1813. The master immediately went on shore, and delivered all the invoices and letters respecting the cargo to the claimants, and they have never been since produced in the cause. At the time of the capture by the privateer America, a prize-master only was put on board; and a question having been made at the first hearing, as to the fact of capture, the district court directed further proof to be made on that point. Upon the further proof, a variety of affidavits were produced by each party, and also a paper signed by the master on the day of the capture, of which duplicates were made, one for the prize-master, and another for the privateer. The paper is as follows: "June 2d, 1813. I hereby certify, that I have this day been captured by the private armed ship America, of Salem, John Kehew, master, and that John Hooper, the 5th, has been put on board as prize master." It further appeared, and indeed was admitted by all parties, that the prize-master took possession of the ship's papers, at the time of the capture, and held them until the 13th of June, when a vessel, supposed to be a British cruiser, was descried, and the papers were handed to Captain Picket, in order to prevent any suspicion of the vessel's being a prize. The vessel turned out not to be a British cruiser, the prize-master demanded back the papers, which Captain Picket peremptorily refused, subducted from the ship's letter bag a letter addressed to his owners, and held the same and the ship's papers in his own possession, until he delivered them to his owners, as I

have before stated. The supplementary proofs, introduced on the part of the claimants, are intended to show, that the brig and cargo never were intended to be captured as prize; but that a prize-master was put on board merely to secure to the captors the property of British subjects, if any, which should be found on board. On the other hand, the proofs of the captors are intended to show an absolute and unqualified capture of the whole property, as prize, and an agreement with Captain Picket, that a prize-master only should be put on board, in order to elude, for the common benefit, the vigilance of the British cruisers. And among the proofs of the captors, the privateer's instructions are introduced, which authorize a capture of American vessels coming from Great Britain.

I do not think it necessary to discuss the statements contained in the affidavits on each side in these supplementary proofs. There are many discrepancies, which it is difficult, if not impossible, to reconcile; and as my judgment is not influenced by a balance of their comparative credibility, I shall not attempt to conciliate their apparent discords. Upon the general complexion of the cause, there can be no doubt, that this vessel was engaged in an illegal traffic with the public enemy. She proceeded to England with a full knowledge of the war, and almost a year after the declaration of war, received a cargo of British manufactures of a very recent purchase. and was captured on her return to the United States. After the solemn decisions in the admiralty, and the courts of common law in England, (The Hoop, 1 C. Rob. [Adm.] 196; Potts v. Bell, 8 Term R. 548,) which have been repeatedly recognized and enforced in this court, I did not think the general doctrine open to discussion, and so at the argument I stated to the counsel of the claimants. Until I shall be taught a different rule by the supreme court, I shall continue to hold, that trading with the enemy is an offence against the laws of war, and subjects the property engaged in the traffic to confiscation. Admitting this doctrine, the defence at the trial turned upon two points. First, that there was no actual capture; and second, that if there was an actual capture, it was illegal, and in express contravention of the instructions of the president of the 28th of August, 1812.

As to the fact of capture, upon the preparatory examinations and papers no possible doubt could arise. In answer to the usual interrogatory, the master and mate explicitly admit the capture, without any qualification or exception. The doubt, if any, must be sought aliunde, in the further proof admitted on behalf of the claimants, after the real pressure of the cause was fully known. The captors contend, that such further proof was, in point of law, inadmissible because no ground of doubt was laid in the original evidence, and because the claimants stand in the character of parties affected with the imputation of illegal traffic; and I think that both objections are of great weight. In general the prize court is solicitous to preserve the simplicity of its proceedings, and will not engage itself in inquiries, which do not spring from difficulties or suspicions attached to the original evidence. It applies this rule to the captors; why also should it not apply to the claimants? I do not say that the court will, in no case, go into collateral inquiries, to satisfy doubts arising from extrinsic sources. We all know, that the invocation of papers from other prize causes is an admitted exception. But if the evidence of facts, which the parties could not but know with precision, be clear and indisputable upon the preparatory examinations, the court will not encourage ingenious subterfuges and new pretensions, not dreamed of in the first instance, to be ushered into the cause. Any other course would be destructive of all simplicity, and lead to endless litigation. It would be setting up false lights, to allure and delude the court into inextricable quicksands. The rule, therefore, is in the highest degree salutary, not to admit, in general, collateral evidence to create doubts, but only to admit it to remove them. And, in a more enlarged view, it is of the utmost consequence to discountenance attempts to foist into a cause supplementary affidavits of the parties examined in preparatory, to explain away or contradict their former solemn statements: Let the parties learn that truth has but one face, and that at their peril they must declare it, in its full extent, in the first instance, and that if they then conceal, they must take the consequences of their own misconduct. So much I have thought it proper to say in vindication of the general rule. In the present case I cast no imputation upon the parties.

The second objection is still more decisive against the admission of further proof. The claimants were avowedly engaged in a trade with the enemy, under circumstances, which, in the prize court, not only prohibit them from the benefit of further proof, but which stamp them and their property with the hostile character, and induce the penalty of confiscation. I speak now of the character of the transaction, not of the character of the parties. The Messrs. Welles are known to me to be very respectable gentlemen, but I am bound to consider this cause, in point of fact and law, exactly as if they were utter strangers, and without excuse or apology for their conduct. In a case then of clear illegality, I would beg to know what right they can have to the benefit of further proof? Their claim must be rejected in limine. Further proof is an indulgence granted to legal innocence and unavoidable error, but never to illicit or hostile conduct. Under such circumstances, as Sir W. Scott has observed in The Walsingham Packet, 2 C. Rob. [Adm.] 77, the claimants can have no right to moot

difficulties in this court, as to the final disposition of the property, or to throw doubts in its path, where none before existed.

There is yet another fact, which is in general so material that I cannot pass it over. It is, that all the letters and papers respecting the cargo have been excluded from the view of the court. The master delivered them to his owners, and the latter have not yielded the custody of them to the court.[3] I advert to this fact, as deserving great consideration in ordinary cases, where further proof is asked for, and I think it will be difficult to show, that it ought to be allowed where there is a voluntary suppression. In the present case the fact becomes altogether unimportant.

With this weight of objections, I have been pressed to overrule or reject the further proof admitted in the district court. I am free to confess, that I cannot surmount the difficulties presented by the objections. My entire deference for the learned judge, who ordered the proof, is a strong inducement not to shut my eyes against evidence, which he deemed material; and as I can satisfactorily to myself dispose of the cause, without rejecting the further proof, I shall not disturb the place, which it occupies in the papers. And I am entirely convinced, that there was an actual capture of the vessel and cargo, whether the original or the supplementary proofs are examined. The written acknowledgment of the master would, of itself, seem decisive. It was written at the time of the capture, when there was no motive to disguise or suppress the real character of the transaction. This acknowledgment and the ship's papers were delivered into the custody of the prize-master. If a capture was not really intended, I should be glad to learn why this was done; and if a capture was intended, I should be glad to find the evidence that limits its extent. Even if the ship's papers had not been put into the possession of the prize-master, it would not have materially affected the case: it is sufficient if they remain on board. It is said that no prize crew was put on board, that the navigation was left to the ordinary crew of the vessel. This objection proceeds upon the supposition, that to constitute a capture as prize, the vessel must be navigated by a prize crew. The supposition is not founded in law. It is true, that the master and crew of a prize ship are not compellable to navigate her, but if they voluntarily engage so to do, it is a legal waiver of the prize crew; and the parties are bound by their engagement, and the capture stands

absolute. Such was the express decision of Sir William Scott in The Resolution, 6 C. Rob. [Adm.] 13, a case which, as to the fact of capture, strongly resembles that before the court. This doctrine has also been fully recognized in the courts of common law, and does not seem to admit of any reasonable doubt. Wilcocks v. Union Ins. Co., 2 Binn. 574. Now, upon the further proof, it is quite impossible not to believe, that the master of the Alexander entered into such an engagement. His whole conduct evinces it, and he must be now estopped in reason and equity from asserting an objection, which he must be held to have waived.

What indeed is necessary to constitute a capture? In ordinary cases the fact admits no doubt, and in point of law, nothing more is necessary, than an intention of capture, followed up by an actual or constructive possession of the property. Force and violence, or physical superiority are not required. It is sufficient, if there be a deditio or submission on the one side, and an asserted possession on the other. In the present case, the animus capiendi must be inferred from the instructions of the privateer, the detention of the vessel, and the subsequent prize proceedings. That there was an actual possession combined with this intention of capture, as conclusively follows from the possession of the ship's papers, the putting on board of a prize-master, and the acknowledgment of the master of the vessel. It is not required, that superior force should be exerted during the whole voyage, to maintain that possession; the acquiescence of the master and crew in the terms of the captors is a full equivalent. In my judgment, the case scarcely furnishes the slightest pretext for a denial of the fact of the capture. Was then the capture legal? This depends on the construction of the executive instruction of the 28th of August, which is as follows: "The public and private armed vessels of the United States are not to interrupt any vessels belonging to citizens of the United States, coming from British ports to the United States, laden with British merchandise, in consequence of the alleged repeal of the British orders in council; but are, on the contrary, to give aid and assistance to the same, in order that such vessels and their cargoes may be dealt with on their arrival, as may be decided by the competent authorities." The captors have argued, that this instruction is illegal and void; in the first place, because congress, to whom the exclusive power of declaring war is confided, have declared it in the most general terms, and it is not competent for the President, by a mere instruction, independent of law, to limit the rights of our citizens under the act of congress. (Act June 18, 1812, c. 102.) In the next place, they contend that no such authority has been delegated by congress. The act of the 18th of June, 1812, c. 102, authorizes the

---

[3] Since delivering this opinion, it has been stated, though the fact did not appear in the evidence, that at the trial in the district court, the Messrs. Welles offered to produce the letters and papers delivered to them by the master, but the district court, on an objection of the captors, was of opinion, that to entitle the papers to be read at the hearing, they ought to have been produced upon the preparatory examination.

president of the United States to issue letters of marque and reprisal, in such form as he may think fit, against the "vessels, goods, and effects" of the British government and its subjects. The authority, as to the form, does not authorize the president to vary the substance of the commission; and if it did, he has not done it, for the present commission is as broad in this respect, as the act itself. The act of 26th of June, 1812, c. 107, § 9, is the only other act which can be relied on. That authorizes the president "to establish and order suitable instructions for the better governing and directing the conduct" of privateers; which can only mean instructions for the internal discipline and management of privateers, but not for the abridgment of the rights of captors under the general act. Much less could it be admitted, that he might, under the act, suspend, by an instruction, the war, as to hostile property, or property which by the laws of war is deemed hostile, and confiscable as such, and is necessarily included in the general provisions of the act declaring war. The Elsebe, 5 C. Rob. [Adm.] 173. This argument, as to the powers of the executive, is certainly entitled to great consideration, and in a proper case would deserve the grave examination of the court. But I shall waive all discussion of it in this place, as this cause may be well decided without touching the legality of the instruction. Admitting its legality in the broadest extent, the instruction cannot, by any reasonable intendment, protect the present case.

It will be recollected, that by the act of the 2d of March, 1811, c. 96, the president was authorized to suspend the operation of the revived sections of the act of the 1st of March, 1809, c. 91, upon the revocation of the edicts of Great Britain, which violated our neutral rights. The celebrated orders in council which were supposed to violate those rights were, by a declaration of the British government made on the 23d of June, 1812, revoked after the first day of the ensuing August. The knowledge of this fact reached the United States in August, although not officially communicated to our government until the 30th of September. As the declaration of war was not known in Great Britain at the time of the revocation of the orders in council, it was immediately foreseen, that American merchants in that country, and British factors having American orders, would act upon the presumption, that the president would exercise the authority of suspension, which had been confided to him. Shipments of goods to an immense amount would therefore be made on the faith of that repeal, before a knowledge of the war could be had, and countermanding instructions given. To prevent merchants from suffering ruin, by a confidence which they reposed in the government of the United States, (a confidence, which congress

have amply and liberally redeemed; see act of the 27th of February, 1813, c. 175,) the precautionary instruction of August was issued by the executive. It carries in its language the most clear and satisfactory evidence of being a temporary measure. Its object was to protect American ships laden with British merchandize and coming from British ports, on the faith that the repeal of the orders in council had extinguished the great controversy between the two nations. But it could avail only, while both countries were in ignorance of the existence of the war. The instruction directs the public and private armed vessels of the United States not to interrupt any American vessels coming (not which at any time afterwards during the war should be coming) from British ports to the United States, laden with British merchandize, (not, with property of British merchants or of public enemies,) in consequence of what? of the war? No; in consequence of the alleged repeal of the orders in council. It does not, therefore, purport to be an order of indefinite future operation, to license and protect a trade with the enemy, or cover the property of enemies, after a knowledge of the war. It extends, in terms and in spirit, to a protection of property shipped in consequence of the repeal of the orders in council, before any other impediment to the trade could be known to the shippers. Upon any other construction, what would be the unavoidable result? By the declaration of war, all future trade between the hostile countries became illegal, and tainted the property engaged therein with the polluting leaven of illegality and confiscation. Yet, upon the construction of the claimants, this instruction not only suspended these legal results of the war, but gave to the trade directly from British ports a perfect and yet unterminated license. War would exist every where, except as to the trade from this favored island, and there an immunity from capture would invite the entire intercourse of peace. British manufactures, even on British account, might be introduced into the United States, to an unlimited extent, in proud defiance of the non-importation act and the laws of war, and the fundamental policy of the government be uprooted. Yet to this extent must the doctrine reach, in order to support the defence of the claimants. If such a doctrine could be engrafted on the instruction, it would strike deep into the very vitals of the country. "Haeret lateri lethalis arundo."

When, by the act of the 6th of July, 1812, c. 129, congress prohibited all trade with British ports under licenses, could it have been imagined, that the president had already a power to grant licenses for the trade, to an unlimited extent, by laws enacted by them almost in the same breath? When by the act of the 27th of February, 1813, c. 175, congress refused to restore the

property of British subjects, which since the war had been shipped to the United States, could they have imagined that a subsisting order of the executive exempted all such property from capture on the high seas, and gave an implied invitation to the trade? When by the act of the 2d of August, 1813, c. 56, congress declared as prize of war all vessels and cargoes covered by a British license, however in other respects the voyage might be legitimate, could they have once thought, that a power was lodged in the president, and then in full exercise, which exempted from capture all American vessels and cargoes coming from British ports? That it was a greater offence to accept a license, than to do the acts, which a license authorized? I admit that congress can only declare what the law shall be for the future, not what it was in times past; but it seems to me, that the whole current of legislation to which the president himself is a party, indicates a policy entirely the reverse of that imputed by the argument to the administration. I do not feel at liberty to strain language in support of such extraordinary pretensions. It has been argued, that the proviso to the first section of the act of the 13th of July, 1813, c. 10, recognizes the legality of this construction: if it does, I think it as clearly carries with it the implication, that the instruction has had its full effect, and is no longer operative. Upon what pretence then can the purchase and shipment of the present cargo be argued to have been made "in consequence of the alleged repeal of the orders in council?" That repeal was itself conditional, and to be void, unless the American government, after notification, revoke the non-intercourse. It refused so to do, and that refusal was known as well in Great Britain, as in the United States, several months before this shipment. In no sense, therefore, could this shipment be referred to that repeal. Besides, a new state of things, a state of absolute hostility, had intervened, and extinguished all peaceable relations, as to commerce as well as to the governments. How then could it be possible, that a shipment, which either party might seize, as prize of war, could be founded on a measure, which was exclusively adapted to peace? In my judgment, there is no ground for protecting the Alexander and cargo from confiscation, as prize of war, under the instruction of the 28th of August. The claim of the Messrs. Welles must therefore be rejected; and that of the United States, as I have repeatedly held, cannot be sustained. I therefore condemn the vessel and cargo, as good and lawful prize to the captors, on account of the illegal traffic with the enemy, and reverse the decree of the district court in all respects, wherein it differs from this decree.

[NOTE. This decree was affirmed by the supreme court. 8 Cranch, (12 U. S.) 169. The decree of the district court is not accessible.]