### THE HELLIG OLAV.*

(Circuit Court of Appeals, Second Circuit. June 7, 1922.)

No. 288.

1. **Shipping ⊜⇒115—Ship, constituting a common carrier, an insurer of delivery at port of destination, unless excused by bill of lading.**

   A ship, constituting a common carrier, was liable as an insurer for failure to make delivery at port of destination, unless excused by the terms of the bills of lading.

2. **Shipping ⊜⇒132(3)—Ship has burden of proving failure to deliver at port of destination due to excepted peril.**

   Where ship, constituting a common carrier, fails to deliver at the port of destination, the burden of proving that such failure was due to an excepted peril under the bills of lading is on the ship.

3. **Shipping ⊜⇒141(1)—Ship held not liable for failure to deliver contraband goods at port of destination, in view of "seizure" and "restraint" by belligerent nation.**

   Where neutral ship was compelled by a belligerent's warship to put into a port of the belligerent country, and informed that contraband cargo would be unloaded unless she guaranteed that, if permitted to proceed to port of destination for delivery of goods not contraband, she would return with contraband goods to belligerent government, and made such guarantee and complied therewith, she was not liable to shipper of contraband goods for failure to deliver such goods at port of destination, in view of provisions of bill of lading exempting carrier from liability for loss occasioned "by arrest or restraint of princes, rulers, or people," and providing that shipment was accepted "at the sole risk of the owners thereof of arrest, restraint, capture, seizure, detention, or interference of any sort by any power," since the failure to deliver contraband goods at port of destination was due to "seizure" and "restraint" of belligerent nation,

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 258 U. S. —, 43 Sup. Ct. 96, 67 L. Ed. —.

within the bill of lading, notwithstanding goods were actually carried to port of destination in neutral country.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Restraint; Seizure.]

Appeal from the District Court of the United States for the Southern District of New York.

Libel in admiralty by the Sulzberger & Sons Company against the steamship Hellig Olav, claimed by the Dot Forenede Dampskibs Selskab. Decree of dismissal (276 Fed. 556) and libelant appeals. Affirmed.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Charles R. Hickox, of New York City, of counsel), for appellant.

Burlingham, Veeder, Masten & Fearey, of New York City (Van Vechten Veeder and Roscoe H. Hupper, both of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. This is a libel against a steamship because of the latter's failure to deliver certain merchandise which it was agreed should be carried from New York to Copenhagen, and for the breach of the contract of carriage damages in the sum of $200,000 are asked.

The libelant is engaged in the business of packing and shipping beef and pork and their products. In March, 1915, the libelant shipped certain meat products from Chicago to Copenhagen on through bills of lading. The goods were delivered at Chicago by libelant to the Traders' Despatch, and bills of lading were issued by the latter, which stated that the goods were to be carried to the port of New York and thence by the Scandinavian-American Line to Copenhagen. These bills of lading provided that the steamer was not to be liable for loss or damage occasioned "by arrest or restraint of princes, rulers, or people."

On the arrival of the goods at New York they were delivered to the Danish steamship Helig Olav, of which Dot Forenede Dampskibs Selskab, commonly known as the Scandinavian Line, is owner and claimant. Upon the delivery of the goods to the steamship in New York, the steamship company issued ocean bills of lading, which bills were the regular forms of bills of lading in use by the steamship company at the time of the shipment, and contained the usual provisions exempting the carrier from liability, including the provision exempting, as respects the property covered by the bills, for loss or damage occasioned by "arrest and restraint of princes, rulers, or people." They also provided that "the shipment is accepted at the sole risk of the owners thereof, of arrest, restraint, capture, seizure, detention, or interference of any sort by any power."

It appears that the vessel left New York on April 1, 1915, and ten days later, when about 70 miles west of Scotland, was stopped by a British war cruiser, and a British officer boarded the ship and required her to proceed to Kirkwall for inspection. On her arrival at

Kirkwall the British naval officers and officials came on board to examine the ship's papers, which they took ashore with them. This happened on April 11th, and on April 14th they were returned to the ship with the information that she could proceed on her voyage. It appears, however, that on the day of the seizure of the papers the managing director of the United Shipping Company, Limited, which was the London agent for the owners of the steamship, was informed by "the Contraband Committee," a department of the British Foreign Office, that the goods involved herein would either have to be removed from the steamer at Kirkwall, or, in the alternative, the company would have to give an undertaking to return them to England for proceedings before the prize court. The United Shipping Company thereupon gave a letter to the Director of Trade Division, Admiralty War Staff, which stated that, in consideration of the steamship being allowed to proceed to Copenhagen, the company guaranteed that the goods specified should be returned to England as soon as possible. This was done for the convenience of the vessel, to avoid the delay to her passengers and to her noncontraband cargo, which would have been occasioned if she had been compelled to unload what was claimed to be the contraband cargo which she had on board.

The ship, having thus been released from detention, sailed from Kirkwall on April 15, and without the presence aboard the vessel of any representative of the British government—that government relying simply on the carrier's undertaking to return the goods to England. When the ship reached Copenhagen, she at once unloaded her cargo, with the exception of that portion which was claimed to be contraband. That she refused to deliver to the consignee, although a demand for its delivery was made by him. The contraband goods were transferred, however, to the Alexandra on April 27th, and were carried by her to the port of Newcastle, England. On the arrival of the vessel at Newcastle on May 1st, the merchandise herein involved was seized as prize, and was subsequently brought into the British prize court and condemned as contraband.

The record contains a copy of a letter from the British Foreign Office, London, May 20, 1915, addressed to the Secretary of the United Shipping Company, Limited, in which the writer says:

"I am directed by Secretary Sir E. Grey, to certify to you that the items of the cargo of your steamship Helig Olav enumerated in the accompanying list were seized by the Admiralty, but that, in view of the guarantee given by your company that all these goods should be returned to this country to be dealt with in the prize court, the steamer was allowed to proceed to her destination on April 14th with the cargo on board."

That the goods were in fact contraband we think is clear although that is not conceded and is not in issue. The crown asked for the condemnation of the goods on the ground that, while they had been consigned to Leopold Gyth in Copenhagen, the latter in reality was the agent in Scandinavia for the German government, and the goods were for that government, and that an indemnity had been given to the consignors by the Deutsche Bank of Berlin. The record of the proceedings in the British court shows that after the government produced its proof the claimant withdrew its claim and admitted its guilt.

The question presented, therefore, is whether the provision in the bills of lading which exempted the carrier from liability for loss or damage occasioned "by arrest and restraint of princes, rulers or people" applies to the facts of this case. The court below was of the opinion that it did, and that there was consequently no obligation to deliver this particular merchandise at Copenhagen, and a fortiori no conversion. The libel was accordingly dismissed, and appeal to this court was taken.

The appellant on this state of facts asks this court to determine certain questions:

First. Can a common carrier of a neutral country, who has received freight and undertaken to carry goods to destination, after its steamer has been required by a belligerent to put into a port of the latter's country for examination, be relieved of the common carrier's obligation to deliver cargo at destination by giving a promise to the belligerent government that the cargo after being taken to destination will be brought to the belligerent country and delivered to the belligerent?

Second. Where a neutral vessel is directed to put into port in a belligerent country for examination, and thereafter, without the disturbance or removal of any cargo on board, is told that she is free to proceed in consideration of a promise by her owners to bring the cargo to the belligerent country, after completion of the original voyage, and the carrier gives such promise, and the vessel in fact does complete her original voyage by proceeding to her destination in a neutral country, where she discharges her cargo, has there been up to that point any seizure or capture of the vessel's cargo by the belligerent country, within the meaning of the words "seizure or capture" in the bill of lading?

Third. Where, under the circumstances just indicated, a common carrier, after discharging the cargo at destination in a neutral country, reloads the cargo into another vessel, and carries it to a belligerent country, and delivers it to a belligerent, can the carrier be protected against the claim of the consignee by an exception of restraint of princes in the bill of lading?

Fourth. Under the circumstances outlined, is not the proximate cause of the failure of the common carrier to deliver the goods to the consignee the intentional performance by the carrier of the promise that it gave for its own convenience and purposes to the belligerent?

[1, 2] We have seen that the bills of lading required that delivery of the goods be made to Leopold Gyth, consignee, or his assigns at Copenhagen. It is agreed that the party issuing the bills of lading was a common carrier. There can be no doubt that as such the ship was liable as an insurer for failure to make the delivery at Copenhagen, unless she was excused by the terms of the bills of lading. Liverpool Steam Co. v. Phenix Insurance Co., 129 U. S. 397, 437, 9 Sup. Ct. 469, 32 L. Ed. 788; The Niagara v. Cordes, 21 How. 7, 23, 16 L. Ed. 41. It is equally plain that the failure to make the delivery placed upon the carrier the burden of proof of satisfying the court that such failure was due to an excepted peril. Clark v. Barnwell, 12 How. 272, 13 L. Ed. 985; The Folmina, 212 U. S. 354, 29 Sup. Ct. 363, 53 L. Ed. 546,

15 Ann. Cas. 748; Morrison v. Shaw, S. & A. C., Ltd., [1916] 1 K. B. 747, 758.

The vessel pleaded as one of its defenses to this suit the restraint of princes clause in the bills of lading. Its allegation is that—

"The nondelivery of the merchandise at Copenhagen was due solely to the arrest and restraint of princes, rulers, and people, and to the detention of the property by the British Admiralty."

And the libelant insists that the facts of the case do not bring it within the exception claimed. It is said that the exception of restraint of princes clause must be dealt with as any other exception in the bill of lading; that if, for instance, the carrier was seeking to rely on an exception of strikes, it would not be any defense to the carrier that he had not made delivery because of a threatened strike. Nothing less than an actual strike that prevented delivery would excuse; and we are asked to hold that what occurred at Kirkwall did not amount to a seizure of the goods, but was only a threatened seizure, which was not actually effected until after the goods had been actually carried to Copenhagen and then carried back to Newcastle. It is said that the goods were actually landed on the wharf at the port of destination, Copenhagen, which was neutral territory, and where the goods were not subject to any claim by any belligerent power.

The able counsel for the appellant in his argument in this court contended that the threat of the existence of an expected peril of whatever kind cannot take the place of the actual occurrence of the peril; that all that occurred in this case was a threat on the part of a foreign government to take certain measures unless the carrier gave a promise not to deliver certain goods to the consignee; that the only restraint that the British ever exerted on the ship or the shipowner was to direct the vessel to proceed to Kirkwall, and then ask the owner to make a promise about future dealings with the goods; that the British government never did exert restraint with respect to the libelant's goods; that all restraint was released when the master was told on the 14th of April that he was free to proceed, and his papers were returned to him; that after the steamer left Kirkwall the position of the shipowner was that he had two promises outstanding. One was a promise to the owner of the goods to deliver at destination. The other promise was contradictory to the first, and was to the British government that he would not make delivery in accordance with his contract. The making of this subsequent promise could not operate as a release of the original promise to the owner of the goods.

It is, of course, true that the making of a second promise, if contradictory of a first promise, cannot discharge the promisor from his liability to the first promisee. But did the second promise violate the first? The answer must depend upon the construction to be placed upon what occurred at Kirkwall. In Craig v. United Insurance Co., 6 Johns. (N. Y.) 226, 5 Am. Dec. 222, an American ship bound from New York to Barcelona, Spain, was stopped by a British cruiser when off St. Michaels, and her commander indorsed her register, warning her not to enter any of the ports of France, Holland, Spain, Denmark, Italy, Portugal, or any other port from which the British flag was

excluded. The trip to Barcelona was abandoned and the ship returned to New York. Chief Justice Kent held that apprehension of capture did not constitute a justifiable ground of abandonment and for calling on the insurer to indemnify. It is noticeable, however, that in that case the learned judge stated that, if the prosecution of the voyage to a conclusion "had become impracticable, or been attended with a moral certainty of seizure or loss, I should have deemed it equivalent to actual restraint."

In King v. Delaware Insurance Co., 6 Cranch, 71, 3 L. Ed. 155, the Venus sailed from Philadelphia for the Isle of France. While prosecuting her voyage and after proceeding 1,000 miles she met a British ship of war, by whom she was detained and warned from proceeding to any port in possession of his majesty's enemies, and that the Isle of France was blockaded, and that the Venus would be a good prize if she proceeded thither. Thereupon the Venus returned to Philadelphia, and the question was whether she was justified in abandoning the voyage, so as to make the insurers on freight liable. The apprehension of possible seizure if the vessel proceeded was unanimously held not sufficient under the circumstances, it being found that the representation was untrue, and that the Isle of France was not actually blockaded, and the court held that the abandonment of the voyage was not justified.

There are other cases holding that the danger must be obvious and immediate in reference to the situation of the ship at the particular time and not merely contingent and indefinite. See Oliver v. Maryland Insurance Co., 7 Cranch, 487, 3 L. Ed. 414; Smith v. Universal Insurance Co., 6 Wheat. 176, 5 L. Ed. 235. The facts recited in Craig v. United Insurance Co., supra, and in King v. Delaware Insurance Co., supra, are not at all analogous to the facts in the case now before the court, and they really throw no light whatever upon the question we must now decide. In those cases there was no capture, no seizure, and no promise or guaranty. There was nothing but a warning that, if the ships proceeded to certain ports, they would be in danger of seizure and of condemnation in a prize court.

[3] In the present case the ship was stopped and required to proceed to a British port, to be further dealt with by the British Admiralty. On her arrival at that port she was not permitted to proceed on her voyage, but was detained there from April 11th until April 15th under compulsion. The libelant's agent in London states that he was informed on April 11th that the ship "had been seized by the British authorities and taken into the port of Kirkwall." Two or three days after the ship arrived in Kirkwall, her captain lodged a protest with the Danish consul in Kirkwall, and wired her owners in Copenhagen that the ship was under arrest. A neutral ship, carrying contraband, is, of course, liable to detention and loss of freight, and if the goods on board this ship were contraband the British authorities had a right to detain her until so much of her cargo as was contraband could be unloaded.

In that situation the British Foreign Office informed the libelant's London agent, as before stated, that the contraband goods would

either have to be removed from the steamer before she could proceed to her destination or a guaranty would have to be given on libelant's behalf that delivery would not be made to the consignees at Copenhagen and that the goods would be brought back from Copenhagen and delivered to the British authorities. Under these circumstances the guaranty was given, and the ship was permitted to proceed. This seems to us a good seizure of goods. The British authorities took constructive possession of them at Kirkwall, and the libelant, by its guaranty, became thereby the agent of the British Admiralty and held actual possession for it until the goods were finally delivered to it at Newcastle. The correspondence shows that libelant's own agent regarded the goods as "seized" at Kirkwall, and the British Foreign Office so understood the matter. The failure to make delivery at Copenhagen was due to the seizure of the goods at Kirkwall, and their subsequent return to Newcastle was under the compulsion of the British government.

In Great Britain seizures as prize are made by executive officers of the crown in the exercise of the crown's belligerent rights. The title of the crown to property seized as prize is not complete without adjudication in its favor by the prize court. As stated by the House of Lords in The Sudmark (No. 2) L. R. (1918) A. C. 475:

"As a matter of practice it is quite common for the captors * * * to hand the prize to some other officer of the crown to be taken into a convenient port."

In the instant case the matter of dealing with the contraband goods after their arrival at Kirkwall was evidently taken under advisement by the officers of the crown in the Foreign Office, with the result that those officials consented to allow the goods to remain on board ship upon the guaranty of the ship's owner to keep them in their possession and return them to the British officials in England. This possession the ship held for the crown, and as agent of the executive officers of the crown. The British officials clearly indicated by what they said that they claimed the right to the goods and denied the right of the ship longer to control them; and the ship clearly indicated its acquiescence in the claim of the British government. This was sufficient. This acquiescence of the ship, even if it can be regarded as voluntarily given, is sufficient in law to support a claim that a capture of the goods had been made. See The Resolution, 6 C. Rob. 13, 22, 23 (1805).

It is said that a seizure involves the taking over of possession from some one else, whose holding is adverse, and that there was no taking over of possession of the libelant's goods at Kirkwall on April 11th, or at any other time until the vessel arrived at Newcastle on May 1st. The New Standard Dictionary defines "seizure" as follows:

"1. The act or an act of seizing; a taking hold forcibly or suddenly, or a taking possession forcibly or by authority of law; as a seizure of a fort by an enemy; seizure of goods by the sheriff."

A capture involves a seizure. To capture is to "seize and hold or carry off." And if a capture can be effected by an intention to capture, followed by taking constructive possession of the property, a seizure can be accomplished in like manner. There is such a thing

as a "constructive seizure" and a "constructive possession," as distinguished from an actual seizure and an actual possession. A sheriff, for example, proceeding under a fieri facias and making a levy upon the goods of a debtor, must take the goods into his possession to acquire a property in them. There must be a seizure of the goods. But it is elementary and according to the common law that there may be a good and legal seizure by construction, even though the officer does not so much as touch the goods, and they remain all the time in the actual possession of the debtor. The latter is regarded as an agent, holding possession for the officer. See Lloyd v. Wyckoff, 11 N. J. Law, 218. And "constructive possession" is that which exists in contemplation of the law, without actual enjoyment or occupation. Brown v. Volkening, 64 N. Y. 76, 80; Jeffrey v. Owen, 41 N. J. Law, 260; Lieberman v. Clark, 114 Tenn. 117, 85 S. W. 258, 69 L. R. A. 732.

In Procurator in Egypt v. Deutsches Kohlen Depot Gesellschaft, L. R. (1919) A. C. 291, the House of Lords had before it a constructive seizure of various German craft at Port Said. The British procurator in Egypt determined to seize the craft and to institute proceedings for their condemnation. He informed the official liquidator of the business of the German Company owning the craft and in charge of its affairs at Port Said of his intentions, and it was agreed between them that the liquidator should continue to hold the craft at the disposal of the crown and the prize court. The procurator did not take actual possession and he put no British representative on board any of the craft. The House of Lords held that the agreement made with the liquidator amounted to a constructive seizure. In referring to the agreement Lord Sumner said:

"It is as though the procurator had pointed to the fleet, assembled in the harbor under the liquidator's eyes, and had said: 'Submit to treat this fleet as seized, and undertake to do with the vessels as the court and its marshal may direct, or I will at once use force, which I have at hand.'"

He continued:

" * * * And as their Lordships are not asked to suppose that the procurator completely overlooked the importance of seizure, they conclude that a sufficient seizure having been arranged by consent, the matter subsequently received no further attention."

The question of what constitutes a capture came before the Circuit Court for the District of Massachusetts in The Alexander, 1 Gall. 532, 1 Fed. Cas. 357, No. 164 (1813). Mr. Justice Story stated the answer to that question by saying:

"What, indeed, is necessary to constitute a capture? In ordinary cases the fact admits no doubt, and in point of law nothing more is necessary than an intention of capture, followed up by an actual or constructive possession of the property. Force and violence, or physical superiority, are not required. It is sufficient, if there be a deditio or submission on the one side, and an asserted possession on the other. In the present case, the animus capiendi must be inferred from the instructions of the privateer, the detention of the vessel, and the subsequent prize proceedings. That there was an actual possession combined with this intention of capture as conclusively follows from the possession of the ship's papers, the putting on board of a prize master, and the acknowledgment of the master of the vessel."

The above case was subsequently affirmed by the Supreme Court in 8 Cranch, 169, 3 L. Ed. 524.

In The Grotius, 8 Cranch, 456, 3 L. Ed. 623 (1814), Mr. Webster appeared for the claimants and argued that the .ship had not been captured. The ship sailed from New York with a cargo for St. Petersburg, and on her return voyage she was overhauled by a British privateer, the commander of which put one man on board of her and instructed him in the presence of her captain to go with the prize master and to permit the master of The Grotius to keep possession of the ship's papers and to navigate her into port. The Supreme Court required further proof to be taken. Further proof was taken, and the question then came before the court again in The Grotius, 9 Cranch, 368, 3 L. Ed. 762 (1815), when the court stated its opinion as to what constitutes in law a valid seizure as prize. It said: .

"It is clear that some act should be done indicative of an intention to seize and to retain as prize, and it is always sufficient if such intention is fairly to be inferred from the conduct of the captor."

In 1825 in The Josefa Segunda, 10 Wheat. 312, 325, 6 L. Ed. 329, the question of the seizure of a vessel alleged to have been engaged in the slave trade was before the court. Mr. Justice Story, writing for the court, said:

"There must be an open, visible possession claimed, and authority exercised, under a seizure. The parties must understand that they are dispossessed, and that they are no longer at liberty to exercise any dominion on board of the ship. It is true that a superior physical force is not necessary to be employed, if there is a voluntary acquiescence in the seizure and dispossession. If the party, upon notice, agrees to submit, and actually submits, to the command and control of the seizing officer, that is sufficient; for in such cases, as in case of captures jure belli, a voluntary surrender of authority, and an agreement to obey the captor, supplies the place of actual force."

In Wilcocks v. Union Insurance Co., 2 Bin. (Pa.) 574, 4 Am. Dec. 480, an American vessel, when on its way to Canton, was stopped by two privateers under English colors who put two men and a boy on board of her and ordered her to Malta for further examination. The ship thereupon proceeded on a course proper either for Malta or Canton for some time, but when she reached the dividing point between the course for Malta and Canton she altered her course and steered for Canton. Later another British privateer took possession of her and carried her into Malta, where she was condemned in a British court. Chief Justice Tilghman of the Supreme Court of Pennsylvania instructed the jury (the case was at nisi prius) that in the case of a captured vessel it was the duty of the captors to put a sufficient force of their own on board, and if they failed to do it they did not take sufficient possession, unless the failure to do so was in consequence of a promise by the neutral crew to navigate her to the destined port, in which case they would be bound by their promise, and must be regarded for the purpose agreed on as the hands of the captors.

The failure in the instant case to put on board the ship of the libelant a representative of the British navy or government to accompany her to Copenhagen and return with the goods to Newcastle is not a matter of any consequence. The sole purpose of putting a prize master on

board a captured ship is to show that the captor has not released or abandoned the thing captured. In The Alexander, 8 Cranch, 169, 179, 3 L. Ed. 524 (1814), Chief Justice Marshall, speaking for the court, said:

"The inability of the prize master to secure the captured vessel against a rescue, should one be attempted, his inability to bring in the vessel without the aid of the hands belonging to her, is, in reason, no proof of abandonment. If the circumstances of the captured vessel be such as to do away all apprehension of rescue, and inspire confidence that the crew will bring her into port, no reason is perceived why the property of the captor may not be retained as well by a prize master alone as by a considerable detachment from his crew. The cases cited to this point by the counsel for the captors are entirely satisfactory."

It is equally true that, if there are other circumstances upon which the captor has a right to rely, and which do away with any apprehension as to the ship's bringing captured goods into a port agreed upon, there is no necessity whatever for placing a prize master on board the vessel. Such circumstances existed in the instant case. The ship was a neutral ship, and the guaranty of the return of the goods to an English port was given by a British corporation. Upon that guaranty, the British government had every right to rely, and it clearly negatived any idea of an abandonment of the capture.

In Cheriot v. Foussat, 3 Bin. 220, 256, the Supreme Court of Pennsylvania, in 1810, speaking through Chief Justice Tilghman, said:

"Seizure and safe possession are all that has been deemed necessary to give jurisdiction; but whether the possession was within the dominion of the captor, or of a neutral, has not been thought material. Sir William Scott, who presides with great ability in the English Court of Admiralty, seemed once disposed to think that jurisdiction could not be assumed, unless the thing captured was within the dominions of the captor; but on full research and reflection he abandoned that principle, being satisfied that the custom of his own nation, as well as of France and the other principal nations of Europe, justified the condemnation of a prize lying in the dominions of a neutral power. This will appear from the case of The Henrique and Maria (November 26, 1799) 4 Rob. 35. The United States have always considered themselves bound by the law of nations; and in return they expect that, in their intercourse with the nations of Europe, all will observe the same law. The principle that I have mentioned with regard to jurisdiction has been recognized by the Supreme Court of the United States in the case of Hudson v. Guestier, 4 Cranch, 293, as applied not only to prizes of war, but seizures for breach of municipal law. Indeed, there seems to be no ground for distinction between these two cases."

In Hudson v. Guestier, 4 Cranch, 293, 2 L. Ed. 625, above referred to, a vessel seized by a French privateer within the territorial jurisdiction of the government of St. Domingo was carried by the captors to a Spanish port in Cuba, and while there was proceeded against and condemned by a French tribunal sitting at Guadaloupe. The Supreme Court (1808), Chief Justice Marshall writing the opinion, declared that seizure vests the possession in the sovereign of the captor, and subjects the vessel to the jurisdiction of his courts, and that the vessel, when carried into a foreign port, is still in his possession; and he stated it to be the opinion of the majority of the judges that the possession thus obtained by capture could not be divested by the tribunals of the country into whose ports the captured vessel was brought, unless there

should be such obvious delay in proceeding to a condemnation as would justify the opinion that no such measure was intended. The dissenting Justices were Chase and Livingston.

If the doctrine thus laid down by the Supreme Court in Hudson v. Guestier is sound it would seem that if the libelant's ship, when she reached Copenhagen, held possession of the contraband goods by virtue of a guaranty given to the government upon its seizure of the goods, then this right to possession was not impaired by going with the goods into the neutral port of Denmark. While it is not in any way controlling upon this court, certainly it is interesting to find in the record that when the libelant's steamship arrived at Copenhagen she had on board, in addition to the contraband goods herein involved and which had been consigned to Gyth, a similar consignment of meat products to E. L. Weiman & Co., Copenhagen. The guaranty given at Kirkwall for the return of the contraband goods to England covered both consignments. While the goods were at Copenhagen awaiting transshipment to England, it appears that the Weiman Company instituted a court proceeding in Denmark, in which they asserted that the libelant was bound by its bill of lading to make delivery of the goods on their arrival at Copenhagen, and that the consignee's rights could not be prejudiced by the agreement made with the British authorities. An injunction was also asked restraining the libelant from complying with the guaranty and sending the goods back to England. The case ultimately reached the Supreme Court of Justice of Denmark, which rendered judgment on November 12, 1917, and affirmed the action of the lower court, which had denied all relief. In the course of its opinion the court refers to what took place at Kirkwall as "a capture and provisional seizure" of the goods, which it declares was warranted by the laws of war.

We state our conclusions as follows:

1. A neutral ship carrying contraband goods, which has been compelled by a warship of a belligerent to put into a port of the belligerent country and informed that she will be detained at such port until her contraband cargo is unloaded, unless she gives a guaranty that if allowed to proceed to her port of destination she will not make delivery of such cargo to the consignees at that port, but will forthwith return the same to the belligerent government, and which in consequence of such compulsion gives such a guaranty, is thereby relieved of the obligation she otherwise would be under to make delivery of such cargo to the consignee at the port of destination, where the goods are carried under a bill of lading which expressly provides that the carrier shall not be liable for loss or damage occasioned "by arrest or restraint of princes, rulers, or people."

2. If a neutral ship carrying contraband cargo is arrested by a war ship of a belligerent, and sent into a port of the belligerent, and there informed that she will be detained until her contraband cargo is unloaded or she gives a guaranty that, if allowed to proceed, she will not deliver such cargo to its consignee, but will return it to the government of the belligerent, this amounts to a "seizure" of the contraband articles.

3. It is immaterial, in view of the guaranty and the circumstances under which it was given, that the contraband goods were actually carried to the port of original destination in a neutral country, were there reloaded into another vessel belonging to the same owner, and carried back to a port of the belligerent which had exacted the guaranty, and there delivered pursuant to the guaranty. The restraint of princes clause applies.

4. The proximate cause of the failure to deliver the contraband goods to the consignee was the seizure of the goods by the belligerent and the consequent guaranty given by the ship. Thereafter the ship no longer held the goods, except as the agent of the belligerent government.

Decree affirmed.