12 U.S. 169
 8 Cranch 169
 3 L.Ed. 524
 THE ALEXANDER, PICKET, MASTER.
 Feb. 1, 1814
 
 1
 THIS was an appeal from the sentence of the Circuit Court for
 
 
 2
 the district of Massachusetts.
 
 
 3
 The following were the material facts in the case:
 
 
 4
 The brig Alexander, William S. Picket, master, sailed from Naples, on the 22d June, 1812, with a cargo of brandy, wine and cream of tartar, with a British license to carry the same from Naples to England. She touched at Gibralter, and there left her deck-load, consisting of brandy, and sailed from thence for the United States. On the 3d of August, 1812, she received intelligence of the war between the United States and Great Britain, and changed her course for England. She was afterwards captured by the British, and sent into Cork, Ireland, and acquitted, and there disposed of her cargo. After seven months detention in Cork, she proceeded to Liverpool, in baliast. At Liverpool, she took in the cargo in question, purchased by Samuel Welles, one of the Claimants, then in England, from the proceeds of the cargo brought from Naples, and sailed from Liverpool for Boston, May 9th, 1813. On the 2d of June following, she was captured by the privateer America, John Kehew, commander, and libelled, as prize, in the district of Massachusetts.
 
 
 5
 When the Alexander sailed from Naples, she and her cargo were owned, one half by the Claimants, and the other half by W. and S. Robinson, of New York.
 
 
 6
 The master, on his examination upon the standing interrogatories, stated that the vessel belonged to J. and S. Welles and W. and S. Robinson.
 
 
 7
 He also stated that, on his arrival in the United States, he delivered to the chief clerk of J. and S. Welles, of Boston, bills of lading, invoices and letters relating to the vessel and goods. These papers were never produced by the Claimants.
 
 
 8
 John Welles, of Boston, claims the vessel and cargo for himself and Samuel Welles, alleging that Samuel Welles, in London, purchased, on their joint account, of the agent of W. and S. Robinson, their half of the brig and the proceeds of the Naples' cargo, before the purchase of the cargo in question. The United States, also, interposed a claim to the vessel and cargo, as forfeited under the non-importation act.
 
 
 9
 In the district Court the claim of J. and S. Welles was rejected, and the property condemned to the United States. From this decree the captors and Claimants appealed.
 
 
 10
 In the Circuit Court the property was condemned to the captors. From this decree the United States and the Claimants appealed.
 
 
 11
 RUSH, Attorney General, stated that it was not the intention of government to interpose.
 
 
 12
 DEXTER, for Claimants.
 
 
 13
 There being no general rule of the law of nations, that every trading with the enemy is unlawful, and there being no municipal law on the subject, an American citizen, surprized abroad by an unexpected war, has a right to use all necessary means to save his property and to secure his return home, provided the means used for that purpose be not inconsistent with the interest of the nation to which he belongs. All the means employed in the present case were necessary to save the property in question: and were so far from being inconsistent with the interest of the United States, that they clearly tended to the national benefit.
 
 
 14
 That there is no general rule of the law of nations prohibiting all trade with the enemy, is a proposition which probably will not be controverted. Even sir William Scott does not deny the right to withdraw funds, upon the breaking out of a war; he allows that cases of this kind are entitled to be treated with indulgence: he only holds, that if a particular mode of withdrawing funds has been prescribed by the municipal law, as by license, for instance, the person who pursues a different mode is punishable. He has, however, expressly decided, that where circumstances rendered it impossible for the party to obtain a license, there the property shall not be condemned, if it be a case where a license ought to have been granted, if applied for. 2, Rob. 264, 322, the Harmony. 3, Rob. 37, 38, the Citto. 5, Rob. 90, the Ocean. 4, Rob. 193, 234, the Dree Gebroeders.
 
 
 15
 No man is bound, on the breaking out of a war, to abandon his property to the enemy; and if no tribunal is established to decide in what cases property shall or shall not be withdrawn, every man must judge for himself.
 
 
 16
 In the case of Hallet v. Jenks, 3, Cranch, 210, there was an entire prohibition of trade; a prohibition more complete than any one which results from any provision of the law of nations; yet this Court decided, in that case, that the party being forced into the prohibited port, and obliged by the public authorities of the place to sell, he might purchase a return cargo. In the present case, the captain of the Alexander, hearing of the war and believing it impossible to reach the United States without capture, conceived himself to be under the necessity of changing his course for England, or losing his vessel and cargo; and, having a license, he determined to deceive the enemy. Being captured by a British cruizer and carried into Ireland, he was libelled, but acquitted upon his license. He was compelled to sell his cargo. What was he to do with the proceeds? Suppose he had sold for bank bills—must he bring them to this country? He could not bring specie; it is prohibited. The only way in which he could withdraw his property was to purchase a return cargo and obtain another license. This course he pursued: and we conceive that he was perfectly justified in so doing. The motives for withdrawing his property, after acquitted, were strong, one among others which might be mentioned was the danger that the deception he had practiced upon the enemy would be detected.
 
 
 17
 2. But allowing, for the sake of argument, that sailing to England after a knowledge of the war, would have been an illegal act—it is clear, in this case, that there was no sailing to England; there was only an intention to go thither; and it is a well known rule of law that the bare intention to commit an illegal act is not punishable. Again, it cannot be contended that the sailing to Ireland was illegal, as the vessel was forcibly carried in there by the enemy.
 
 
 18
 3. This is a case, which comes within the additional instruction of the president of the United States to our public and private armed vessels, issued August 28th, 1812. That instruction prohibits the interruption, by our public and private armed vessels, of 'any vessels belonging to citizens of the United States, coming from British ports to the United States laden with British merchandize, in consequence of the alleged repeal of the British orders in council.' Kehew, the commander of the privateer, had received this instruction.
 
 
 19
 As to the power of the president to issue such instructions, there can be no doubt. Even if there were no act of Congress relating to the subject, the general power of the executive to direct all hostile operations, gives him the particular power in question. But congress has sanctioned the instruction in question by the proviso contained in the 1st sec. of the act of 13th July, 1813. Laws U. States, vol. 12, p. 16.
 
 
 20
 But it will be said, perhaps, that this instruction is applicable only to vessels sailing from a British port after the repeal of the orders in council, and before the knowledge of the war. Such a construction is erroneous. By the act of congress last mentioned it is pro ided; That nothing in the said act contained shall extend to any capture made by private armed vessels, in violation of the additional instructions of the president of 28th Aug. 1812, after the captor 'shall have been' apprized thereof. From the use of the phrase, 'shall have been,' it is clear that the instructions were in force as late as the date of the act of 13th July, i. e. nearly a year after the instructions in question were first given by the president. Government also continued to issue these instructions to the privateers, up to the time of the trial of this cause in the district Court, and afterwards. Now to what vessels coming from a British port and laden with British merchandize, could those instructions apply which were issued more than a year after the declaration of war? Surely not to vessels which sailed while the orders in council were supposed to be repealed, and which had not heard of the war: it would be absurd to suppose that there were any such, so long after the event had taken place. The instructions, therefore, must be considered as having been originally intended to apply to vessels sailing with a knowledge of the war, as well as to those sailing without that knowledge. Again, what was the great object government had in view in issuing these instructions? No doubt to give our citizens an opportunity of withdrawing their property from the enemy's country, and bringing it to the United States. Our citizens had immense funds in England. The whole commercial capital of the United States was there. It was an object of vast importance to get it home; and so long as Great Britain would permit us to withdraw it, it was our interest to afford to our citizens every possible facility in aid of that permission. This was the policy of our government, and this the source of the instructions.
 
 
 21
 3. This was not a capture jure belli. The eruizer was afraid of running the risk of damages for an illegal capture. An understanding was, therefore, had between the parties, which was considered as being mutually beneficial, that the captor should preserve his claim to any British goods which might be found on board, and that the residue should remain to the Claimants. A single man only, not a prize crew, was put on board the Alexander. The prize master alone was utterly unable to secure the vessel against a rescue, should one be attempted. He was utterly unable to bring her into port, without the aid of the hands originally belonging to her. How, then, can it be considered as a capture? But if the Court should finally decide it to be a capture, we shall contend that it was only partial, a capture of the British goods only.
 
 
 22
 PITMAN, contra, contended, on behalf of the captors,
 
 
 23
 1. That Samuel Welles being in England at the time of the purchase of the cargo, he is to be presumed there animo manendi, and is clothed with a British character.
 
 
 24
 2. That the suppression of papers connected with the origin of the voyage, affords a sufficient presumption of a concealment of enemy interests, to subject the vessel and cargo to condemnation.
 
 
 25
 3. That the vessel and cargo, being taken in trade with the enemy, are condemnable to the captors as enemy's property.
 
 
 26
 As to the first point. It appearing that S. Welles was residing in England at the time of the purchase of the property in question, it is incumbent on him to explain the circumstances of his residence there. This has not been done. The presumption, then, must be that he was in England animo manendi; that the property was, of course, hostile and liable to condemnation. 1, Rob. 87, 103. The Bernon.
 
 
 27
 On the second point little need be said. Suppression of papers is always a suspicious circumstance. In the present case it will, no doubt, have its due weight with the Court.
 
 
 28
 Third point. That here was an actual trading with the enemy, the claimants do not attempt to deny; but they would justify it on the ground of necessity. They say that the vessel was captured by the enemy and carried into Ireland, where she was compelled to sell her cargo, and had no other means of securing the proceeds, but by laying them out in the purchase of British goods. This plea of necessity comes with a very bad grace from the Claimants. If there were any necessity, it was one voluntarily brought upon themselves. They voluntarily and, as we contend, unnecessarily, placed themselves and their property in the power of the enemy, after a knowledge of the war; and can therefore claim no indulgence on the ground of necessity.
 
 
 29
 The cases which have been cited in which sir William Scott speaks with indulgence of withdrawing funds, are inapplicable to the present case. Where the withdrawing of funds in spoken of, those funds only are meant which were in the enemy's country before the war; which was not the case here. Besides, the cases cited depend not on trade with the enemy, but on domicil. A license to withdraw the property would not have been granted in such a case as the present, in England. The president of the United States, acting on English principles, could not have granted a license, supposing him to have the same power in relation to the subject which the king of England has. But he has no such power. Congress has not invested him with it, though they might have done so; and this Court, it is presumed, will not undertake to say that the present is a case in which a license would have been granted, supposing the president to have possessed the power. No such power, then, having been granted by congress, it is to be presumed that they did not intend there should be any exception to the general rule, that trade with the enemy is unlawful.
 
 
 30
 But it has been urged that this case comes within the president's instructions of 28th of August, and that this capture, being in violation of those instructions, is void. The vessels contemplated by those instructions are described as vessels coming from British ports, 'n consequence of the alleged repeal of the British orders in council.' Now it is clear that the Alexander did not sail from the enemy's port in consequence of that alleged repeal; she cannot, therefore, be within the meaning of the instructions.
 
 
 31
 The delivery of the instructions to cruizers, after the case contemplated by them no longer existed, is quite unimportant, notwithstanding the great stress which has been laid upon that circumstance by the Claimants. The thing is very easily accounted for. The instructions may have continued to be issued through mere inattention: but the counsel for the Claimants, in the explanation which he has attempted, has given to them a construction in direct hostility both with their letter and spirit. . . .. See letter from the secretary of state to Mr. Russel, of August 21, 1812, accompanying the president's message of Dec. 1812.
 
 
 32
 It has been also contended that there was no capture. But here is the property before the Court, and we trust they will not restore it, unless non-capture be fully proved; and even then there can be no restoration unless the Claimants prove their right; which they have not yet done. They have produced no title papers, no documents whatever, proving property in themselvs.
 
 
 33
 On this point of non-capture, which was insisted on in the Courts below, the District Court ordered further proof. We contend,
 
 
 34
 1. That as the preparatory examinations prove a capture, no further proof should have been ordered.
 
 
 35
 2. That the further proof establishes the fact of the capture.
 
 
 36
 3. That the proof upon this order offered by the Claimants, was inadmissible, being the depositions of the captain and mate, who were examined in preparatory.
 
 
 37
 As to the putting no prize crew on board, that is a circumstance which in no degree alters the nature of the case; it is not essential to capture. The capture is always made before either a prize master or crew are put on board; and if the circumstances of the captured vessel be such as to do away all apprehension of rescue, and inspire confidence that the crew will bring her into port, there is no reason why the property of the captor may not be retained as well by a prize master alone, as by a considerable crew. The object, in such cases, in putting a prize master on board, is merely to keep possession, and shew that the vessel is not abandoned. 6 Rob. 21. The Resolution. 4 Rob. 316, 386. The William and Mary.
 
 
 38
 PINKNEY, on the same side.
 
 
 39
 If the declaration of war is to be considered as confining captures to property belonging to British subjects, municipally speaking, there is an end of the belligerent rights of the United States upon the ocean. But it is not so to be considered; it is to be construed by the law of nations.
 
 
 40
 The Claimants seemingly deny that there was any capture in this case; but they in fact contend, not for non-capture, but abandonment. We contend that there was a capture, and that it has not been abandoned. It was unnecessary to put a prize crew on board to navigate the vessel to the United States, for she was already bound thither. If it was the intention of the captor to abandon her, why put any person on board? The very circumstance of putting a prize master on board, clearly evidences an intention not to abandon.
 
 
 41
 It is perfectly immaterial whether the capture was absolute or conditional only, to secure the British property found on board: To secure that, it was necessary to capture the whole: The capture cannot be considered as partial.
 
 
 42
 It is said, on the part of the Claimants, that there is no general rule of the law of nations that every trading with the enemy is unlawful. We are of a different opinion. Bynkershoek lays down the rule. Bynk. Q. J. P. book 1, c. 3.Vattel gives it by implication. He says that, in time of war, not only the two belligerent nations, in their politic capacity, are enemies, but that all the subjects of the one are enemies to all the subjects of the other inclusively. Vattel, lib. 3, c. 5, § 70. Sir William Scott, in the case of the Hoop, 1 Rob. 167, has laid down the rule the universal rule. The exception which he allows to this general principle is, that, under certain circumstances, funds may be withdrawn with license from the war-making power. So in the United States licenses for the same purpose may be granted by the same power. But this, as has been already observed, is not a case of withdrawing funds; the funds entitled to the benefit of the exception are such only as were in the country before the war.
 
 
 43
 It is said by the counsel for the Claimants, that the intention to sail to England was not carried into effect, and therefore no illegal act was committed, even supposing that the act, if committed, would have been illegal. But we contend that the offence was consummated by the overt-act of sailing for the enemy's country several days. Such is the law in the case of blockade. Such, also, it is stated to be by sir William Scott, in the case of a vessel sailing to a port which was captured, during the voyage, by the nation to which the vessel belonged. By all the analogies of law an intention in part executed completes the offence. 1 Rob. 132, 156. The Columbia.
 
 
 44
 But it has been denied that the act, if carried into execution, would have been illegal, in the present case; it has been urged that the safety of the property required it. But the law of nations does not permit a man to secure his property by taking it to the enemy's country.
 
 
 45
 The case of Hallet v. Jenks, was cited as supporting the claim of the Appellants. But there, compulsion to sell and to take the produce of the enemy's country in payment, was part of the case stated. Here, the purchase of a return cargo, was voluntary; which materially alters the case. Welles ought to have left his funds in the enemy's country.
 
 
 46
 As to the additional instructions of the president, they clearly do not embrace this case, either by their letter or spirit. An expectation had been raised that, upon the repeal of the orders in council, our non-intercourse would cease. The instructions were intended to meet this case—to redeem the pledge, and save the national faith. These instructions are explained by the act of congress of January 2, 1813, authorizing the remission of the forfeitures incurred under the non-intercourse. That act directs the secretary of the treasury to remit the forfeitures in the case of such American property only, as sailed before the 15th September, 1812; a time by which the merchants in England were presumed to have been undeceived.
 
 
 47
 The proviso to the act of 13th July, 1813, does not alter the nature of the instructions; it leaves them to be expounded by the Courts.
 
 
 48
 DEXTER, in reply.
 
 
 49
 This is a more favorable case than if the property had been in the enemy's country before the war. The object going to England, was merely to save the property from British capture, to which it was exposed, and for this purpose to pass through the enemy's country in disguise—conduct perfectly justifiable in a case like this.
 
 
 50
 As to the capture, no evidence has been produced to prove the fact. If there had been any agreement that this should be considered as a capture, we will admit that it would have been one. But no such agreement is shown—it does not appear that any thing of the kind was intended.
 
 
 51
 But supposing it to have been a capture by agreement—even then the extent of the capture must be limited by the terms of that agreement. 1 Rob. 204, 243. The Jonge Jacobus Baumann.
 
 
 52
 There is no evidence of Welles being in England animo manendi.
 
 Monday, March 7th. Absent. TODD, J.
 
 53
 MARSHALL, Ch. J. delivered the opinion of the Court as follows:
 
 
 54
 The principles settled in the case of the Rapid decides this cause so far as respects the character of the Alexander and her cargo. In open sea, unpressed by any peculiar danger, with a full knowledge of the war, she changes her course and seeks an enemy's port. If such an act could be justified, it were vain to prohibit trade with the enemy. The subsequent traffic in the enemy country, by which her return cargo was obtained, connects itself with this voluntary sailing for an enemy port; nor does the circumstance that she was carried by force into Ireland, when her actual destination was England, break the chain. The conduct of the Alexander is much less to be defended than that of the Rapid.
 
 
 55
 But it is alleged by the Claimants, that in this case there was no actual capture. This allegation cannot, in the opinion of the Court, be sustained. That the America took possession of the Alexander with the intention of making prize of that part of her cargo which might be deemed British, is not controverted. How was this intention to be executed, how was this part of the cargo to be libelled, if it was not captured? And if such part of the cargo as might eventually be British, was captured, and the whole remained together in the vessel, how can the capture be considered as partial?
 
 
 56
 But it has been truly observed, that it is not non-capture, but abandonment, for which the Complainants in fact contend.
 
 
 57
 But while the whole cargo remains together, claimed by the captor, if it be enemy property, how can any part of it be said to be abandoned? If it was entirely abandoned, for what purpose was one of the crew of the America put on board the Alexander?
 
 
 58
 The inability of the prize master to secure the captured vessel against a rescue, should one be attempted, his inability to bring in the vessel without the aid of the hands belonging to her, is, in reason, no proof of abandonment. If the circumstances of the captured vessel be such as to do away all apprehension of rescue, and inspire confidence that the crew will bring her into port, no reason is perceived why the property of the captor, may not be retained as well by a prize master alone, as by a considerable detachment from his crew. The cases cited to this point by the counsel for the captors are entirely satisfactory.
 
 
 59
 With as little reason do the Claimants seek to shelter themselves under the instructions of the 28th of August, 1812. Those instructions apply, in express terms, to such American vessels as have sailed from Great Britain for the United States, 'in consequence of the alleged repeal of the British orders in council.' A vessel which sailed while those orders were not alleged to be repealed, cannot bring herself within these instructions.
 
 
 60
 But it is alleged that these instructions are still issued, and must mean something. Rather than ascribe their continuance to inattention, the counsel for the Claimants would give them a construction in direct hostility with their letter and spirit. Were this reasoning even admitted to be correct, which it is not, it would become the duty of the Court to be astute in finding some object to which they might possibly apply. It is possible though certainly it is barely possible, that some vessels which sailed from England while the orders of council were supposed to be repealed, may not yet have reached the United States. It would be more reasonable to reserve these instructions for such possible case, than to apply them to cases which can neither be brought within their words nor their meaning.
 
 
 The sentence is affirmed with costs