## MITCHELL INV. CO. v. REPUBLIC STEEL CORP.

### No. 5503.

District Court, N. D. Ohio, E. D.

July 3, 1944.

Sidney Weitz and Payer, Corrigan, Bleiweiss & Cook, all of Cleveland, Ohio (Harry Payer, of Cleveland, Ohio, of counsel), for plaintiff.

Jones, Day, Cockley & Reavis, of Cleveland, Ohio (Luther Day, of Cleveland, Ohio, of counsel), for defendant.

WILKIN, District Judge.

This cause came on for trial and at the conclusion of the plaintiff's case in chief the defendant made a motion to dismiss and for judgment on the ground that plaintiff had shown no right to relief. Because the testimony upon which the plaintiff relied was all record evidence and because court and counsel thought the controlling issues had been raised by the motion, the trial was

continued, briefs were prepared, and oral arguments made. Judgment of the court on the motion was reserved until a review of the evidence and a study of the briefs could be made.[1]

The controversy had its inception in a "Plan of Affiliation" agreed to by the Corrigan, McKinney Steel Company, party of the first part, and Edward F. Clark, H. C. Fownes, R. T. Wilson, J. W. Ford, and Elton Hoyt, parties of the second part, acting for and in behalf of themselves and all holders of stock of the Newton Steel Company, and the question is whether that Plan and subsequent acts of the majority stockholders of Newton were legal. The Plan was dated June 30, 1932, and was occasioned by the exigencies of the time and the necessities of the business of the two steel companies. The Corrigan Company was a manufacturer of steel bars and was the chief source of supply of raw material for the Newton Company. The Newton Company was a manufacturer of steel sheets and was the chief outlet for the product of the Corrigan Company. The Newton Company had two plants, one at Newton Falls, Ohio, and one at Monroe, Mich. The Ohio plant was closed prior to the date of the affiliation agreement.

During the general business depression inland steel plants found it difficult if not impossible to meet the competition of plants located on the waterways. The construction of the Monroe plant in 1929–30 was probably prompted by that fact as well as by improvements in the method of rolling sheets developed about that time. The construction of the new plant and the stringency of business conditions had involved the Newton Company in heavy obligations and prior to the Plan of Affiliation the Corrigan Company had given financial assistance to the Newton Company. In January, 1932, the Newton Company provided for a first mortgage 7% Gold Bond issue in the principal amount of $4,000,000, and $3,000,000 of such bonds were immediately issued to the former holders of Gold Notes which had matured December 31,

1931. At Newton's request Corrigan purchased $129,000 worth of Gold Notes from holders who had refused to exchange them for bonds and had then exchanged such notes for a like amount of bonds and had also guaranteed the payment of $25,000 worth of Newton's bonds in order to induce another holder of Gold Notes to exchange them for bonds. Prior to 1932 there were in existence contracts between Corrigan and Newton by which Newton agreed to buy and Corrigan agreed to sell steel bars, and Newton had been buying practically all its bars from Corrigan.

By the terms of the Plan Corrigan became obligated to issue certain shares of its stock to those shareholders of Newton who desired to exchange on the basis stated in the Plan. It was further provided that shareholders who desired to make such exchange could deposit their shares at any time to and including August 15, 1932, at which time the Plan became operative if 67% of the outstanding shares of Newton, common and preferred, had been so deposited for exchange. The Plan further provided that "The Newton Steel Company is in need of additional working capital and it is contemplated that Corrigan, McKinney may make advances to Newton by way of cash or credit, accepting notes of Newton for the amount of such advances, such notes to be secured by the pledge * * * of bonds * * * in an aggregate principal amount double the amount of each such note, the bonds so pledged being also security for any and all obligations of Newton to Corrigan, McKinney in addition to said notes".

A copy of the Plan of Affiliation was mailed to all the shareholders of Newton accompanied by a statement, signed by the parties of the second part, setting forth the reasons for the affiliation and stating that the directors of Newton had agreed to exchange their holdings in that company for stock of the Corrigan Company under the Plan. The Plan and such statement were also accompanied by a copy of the balance sheets of both steel companies. In

---

[1] The court expresses appreciation and commendation of the efforts of counsel to develop the issues in a manner that greatly conserved the time of the court. This kind of case, under the old rules of practice, might have required weeks of trial effort and much bootless controversy and then would have been determined in the end by consideration of the very same issues that have been here presented in a minimum of time and with a minimum of effort after a comparatively brief pre-trial conference. The facility of presentation has in no manner, however, abbreviated or diminished the court's study and consideration of the case.

accordance with the Plan 80% of the outstanding shares of Newton was surrendered for stock of the Corrigan Company.

This suit is brought by and for the holders of the remaining 20% of outstanding shares of Newton. The Plan became operative on August 15, 1932, and was approved by Corrigan shareholders on August 26, 1932. On September 28, 1932, Messrs. Ford, Fownes, Hoyt, and Butts resigned as directors of Newton and Messrs. Ferris, Croxton, Gillies, and Mather (of the Corrigan board) were elected to fill the vacancies. Clark resigned as President of Newton and was elected as General Manager. Gillies, who was then President of Corrigan, was also elected as President of Newton to succeed Clark.

In November, 1932, arrangements were made between Newton and Corrigan, as reported to their respective boards, whereby a large quantity of bars was shipped by Corrigan to Newton by boat for storage on a consignment basis at the Monroe plant. This arrangement was made to afford Newton lower freight rates and Newton was allowed to pay for the bars as it used them. Such consignment agreement was subsequently amended and supplemented. By action of the boards of both companies the listing of Newton's stock on the New York Stock Exchange was discontinued. In November, 1933, Corrigan and Newton entered into a finance agreement which had been worked out by the respective committees of the two companies to provide for extension of credit and monetary advances to Newton by Corrigan.

By February, 1933, Corrigan had advanced to Newton $500,000 and had accepted bonds as provided in the affiliation plan and Corrigan had further extended credit to Newton on open account in the amount of $253,796.62. In June, 1933, Corrigan advanced to Newton the funds necessary to meet the interest on Newton's bonds due July 1. In November, 1933, Corrigan notified Newton that it could not extend further unsecured credit, and Newton's board authorized its officers to give Corrigan security for payment of bars purchased, by assigning accounts receivable.

Newton's annual report for 1933 showed a net loss of $1,026,795.68. On January 25, 1934, Newton was indebted to Corrigan in the amount of $1,528,521.95 for bars purchased. At that time Newton authorized the sale to Corrigan of finished products to the extent of $200,000 and the execution to

Corrigan of leases for sufficient space in Newton's plants to store the products. In March, 1934, Corrigan extended further credit for necessary equipment in Newton's Monroe plant, and in July of that year a further extension of credit was made by Corrigan to enable Newton to pay bond interest then due. During the summer of 1934 Newton considered methods of refunding its bonds which were to mature January 1, 1935. A committee recommended to the Newton board that the company endeavor to refund with a new issue of 5% bonds, provided arrangements could be made with Corrigan to guarantee the principal and interest of the new bonds.

On August 27, 1934, the Corrigan Company and the defendant Republic Steel Corporation entered into an agreement by which on September 23, 1935, the defendant acquired in exchange for certain stocks and bonds all the assets of Corrigan and assumed all of Corrigan's obligations and liabilities. All the shares of the Newton Company which were owned by Corrigan and the obligations of the Newton Company to the Corrigan Company were included in the assets so acquired by the defendant. Corrigan's activity in the steel business then terminated.

In September, 1935, directors for the Newton Company were elected and representatives of the defendant Republic Steel Corporation were added to the board. During October, November, and December the defendant purchased all the bonds of the Newton Company outstanding, except $134,000 worth, and it advanced that amount to Newton in order that Newton might retire such bonds. Newton's annual report for 1935 disclosed a loss of $827,-138.64, and that Newton was indebted to defendant in the amount of $1,799,821.54. The accumulation of unpaid dividends on Newton's outstanding preferred stock was $723,800.

At the annual meeting of Newton's shareholders in April, 1936, the critical condition of the company was reported. It was stated that Newton was continuing to suffer losses; that it was impossible for it to compete successfully with its present equipment against companies with continuous-type sheet mills. It was also reported that Newton was heavily indebted to the defendant; that the defendant owned all Newton's outstanding bonds, which were in default; and that defendant had indicated that it could not continue to extend

credit to Newton and was contemplating foreclosure proceedings under the mortgage securing its bonds. On July 3, 1936, at the instance of this defendant, the trustees named in the Newton bond mortgage instituted foreclosure action in Ohio and on July 13 a similar action was instituted in Michigan.

While those foreclosure suits were pending the defendant continued to advance funds to Newton to keep its plant in operation, in spite of the fact that the indebtedness of Newton to defendant on open account was $1,060,794.80. On March 17 the mortgaged property in Ohio was sold at judicial sale to the mortgage trustees, and the property in Michigan was sold on August 24, 1937. A deficiency judgment was entered in the amount of $536,989.61. During August, 1937, Newton sold to defendant its property not covered by mortgage, consisting of finished products, work in process, stores, supplies, and miscellaneous equipment.

On July 30, 1936, this suit was instituted, the prayer of the original complaint being for an injunction against the prosecution of the foreclosure suits and an award to plaintiff of compensation for its shares in Newton on the same basis as former shareholders received. In June, 1942, an amended and supplemental complaint was filed.

While these are the essential facts upon which the plaintiff bases its complaint, a reference to the evidence or the recitation of facts in the briefs would be necessary in order to obtain a more complete understanding of all the transactions between Newton and Corrigan, and between Newton and the defendant. The complaint of the plaintiff is that the minority stockholders who refused to accept the exchange of stock provided for by the Plan of Affiliation have not received any compensation for their stock, although the affiliation and the ultimate sale of Newton property became effective and all the assets of Newton were liquidated. To quote from plaintiff's brief:

"There are two grounds of recovery stated which may be consolidated into the one simple statement that: what was done was unlawfully done in two ways, each of which creates a cause of action and complements the other:

"(1) That what was tantamount to a merger or disposition of Newton assets was effectuated without submitting the same to a vote in a meeting of Newton Stockholders, thus depriving these non-consenting stockholders of their statutory right under G.C. § 8623-65 and G.C. § 8623-67 of the Ohio Code, to have evaluation made of their stock by disinterested appraisers and decree of the Common Pleas Court.

"(2) That at instance of the directors of Newton, without ratification at any Newton Stockholders meeting, possession and control of all the Newton assets and business were surrendered to Corrigan in September of 1932; and thereafter Corrigan seized, dominated and controlled Newton, in derogation of the rights of these minority stockholders; in short, unlawfully exercised dominion over Newton as though they completely owned it."

The motion filed by the defendant challenges the right of the plaintiff to any relief in view of the facts revealed by the evidence.

The plaintiff first contends that the evidence shows what in substance was a merger but that the nonconsenting stockholders were not given the rights accorded them by those statutes of Ohio which govern the merger of corporations. The defendant denies that there was a merger or any attempt at merger.

The second contention of the plaintiff is that the control of Newton's business by men connected with Corrigan was a control of the Newton Company by Corrigan and a surrender of Newton property to Corrigan and an unlawful domination of Newton in derogation of the rights of minority stockholders. Defendant denies that there was any surrender of property or control to Corrigan and affirms that the title of Newton was preserved and that the control of Newton's business by the duly elected board of directors was a lawful control and in no way violated the rights of any stockholders.

The evidence reveals rather free use of the word "merger". For about two years prior to the date of the Plan of Affiliation, officers, stockholders, and agents of the two companies had been negotiating with the view of bringing about a merger or some other cooperative relationship. In the course of those negotiations the word "merger" frequently appears in company records and written documents. The negotiations, however, culminated in the "Plan of Affiliation" (Plaintiff's Exhibit 2), and even a cursory reading of that instrument reveals that it was not a technical or actual merger. It merely provided for the

sale of stock by Newton stockholders to the Corrigan Company in exchange for stock of the Corrigan Company. Counsel for plaintiff admit that the Plan is not a technical and complete merger, but they contend that subsequent events culminated in the domination of the Newton Company by the Corrigan Company and the ultimate sale of all the property of the Newton Company to the defendant Republic Steel Corporation.

█ It seems clear to this court that the parties to the Plan did not contemplate a merger as provided for in the Ohio Code and that therefore since the proceedings were not in accordance with the Ohio statutes the plaintiff cannot claim rights under G.C. § 8623-65 and G.C. § 8623-67. The plaintiff cannot sustain rights specified for a procedure which was not adopted. In spite of the fact that the property of Newton passed ultimately to the defendant, the identity of the separate corporations was maintained and Newton's corporate existence and activities extended beyond the date of the foreclosure suit. The statutes prescribing the rights of minority stockholders in cases of merger or sale of all assets therefore do not apply.

We must therefore analyze plaintiff's second ground of complaint. This claim is based upon the contention that Corrigan and Corrigan's successor in title and in responsibility, the defendant herein, exercised unlawful dominion over Newton in derogation of the rights of minority stockholders. The plaintiff does not say that the directors and officers of Newton subsequent to the Plan of Affiliation were not technically qualified as such. It does not question the sale of the stock of Newton's stockholders to the Corrigan Company, nor the election of directors and officers after such sale. The plaintiff's complaint is based upon the equitable principle that protects minority stockholders against exploitation by the majority stockholders.

The complaint is not the usual action for fraud or mismanagement. Plaintiff's counsel said specifically at the time of argument that its complaint was "reconciled with an entire absence of a charge of fraud". The claim is based upon the breach of a fiduciary duty "not dependent on fraud or mismanagement". (Rec. p. 31). The charge is that the Plan of Affiliation and the subsequent operations thereunder constituted an unlawful domination of Newton's property and business and a usurpation of the rights of the minority stockholders. Plaintiff contends that the effect of this domination and control was to effect a merger and ultimately a sale by a method which avoided the responsibilities imposed by sections 8623-65 and 8623-67 of the General Code of Ohio. As indicated above, however, the disinclination or failure of the parties to the Plan to comply with the provisions of the Ohio Code, cannot be held to impose liability if the method which was employed for affiliation was in itself lawful. The ultimate issue therefore is: Was the Plan of Affiliation and the subsequent procedure an unlawful domination or usurpation of the rights of the plaintiff in the Newton Company?

In support of its contention that the evidence discloses an unlawful domination, the plaintiff relies mainly on three cases: (1) Mason v. Pewabic Mining Co., 133 U.S. 50, 10 S.Ct. 224, 3 L.Ed. 524; (2) Meyerhoff v. Bankers Securities, Inc., 105 N.J.Eq. 76, 147 A. 105; (3) Birch v. Stacey, 29 Ohio N.P., N.S., 1. All three cases were suits for injunction to restrain unlawful action threatened by the majority stockholders or directors. The minority stockholders did not seek payment of the value of their stock. In the first case it was held that on the dissolution of a corporation at the expiration of its charter each stockholder had the right to have the partnership property converted into money. The majority stockholders could not compel the minority to accept stock of a new company which they had organized, at a value fixed by the majority. The facts of that case do not correspond to those in the case at bar. In the present case minority stockholders kept their stock and if there had been any value in the minority stock, the minority stockholders would have received it upon liquidation.

In the second case it was held that neither the directors nor a majority of the stockholders are empowered to dispose of all the assets of a corporation, except in the manner prescribed by statute, over the objection of any of the stockholders. A majority of the stockholders attempted to transfer all the assets of the company to a new company in which the majority held stock. The purpose of the new company was to engage in the business formerly conducted by the old company; and it was held that the minority shareholders of the old company who did not own stock in the new company could not be sold out at a

figure arbitrarily fixed by the majority; that a majority of stockholders cannot at their own mere caprice sell out all the assets of the company and invest the capital in another enterprise, where the minority desire the prosecution of the business in which they had engaged. It is distinguished from the case at bar by the fact that all the property of the corporation was being sold at a price fixed by the majority, whereas in the present case the Plan provided for exchange of shares in one corporation for shares in the other and all stockholders were treated alike, the final transfer of corporate property in the present case being made at judicial sale instead of at private sale.

■ In the third case the directors of a competing corporation were restrained from exercising a stifling control over a corporation against the interests of the minority stockholders. In the case at bar, Corrigan and Newton were not competing companies, and there is no evidence of any purpose on the part of the majority stockholders to use their control for the purpose of stifling competition. In both cases last mentioned the corporations were doing a prosperous business, whereas in the case at bar the evidence is clear that the Newton Company had been operating at a loss and was in severe financial difficulties. As was said by the court in the Meyerhoff case, supra [105 N.J.Eq. 76, 147 A. 107]: "Throughout the body of equity jurisprudence there runs a rule which is never relaxed, and that is that all our principles and doctrines are to be applied in view of the circumstances of each particular case. The principle upon which the Kean v. Johnson Case [Kean v. Johnson, 9 N.J.Eq. 401] is based, by the very terms of the language already quoted, applies only in the case of a prosperous corporation or partnership. * * * In all the cases on this subject the deciding feature is the prosperity or lack thereof in the corporation."

The present case is like the case of Sewell v. East Cape May, etc. Co., 50 N.J.Eq. 717, 25 A. 929, referred to in the Meyerhoff case: " * * * the corporation was threatened with a foreclosure of a mortgage encumbering all the property it possessed, which was depreciating in value, and its debts were large and all attached to the entire property."

■ As to the justice and correctness of the decisions in the three cases cited, there is no doubt. Neither is there any doubt as to the general principle that equity will restrain arbitrary and capricious acts on the part of majority shareholders or directors if such acts violate the rights of minority stockholders. The question in this case is whether the extinction of the interests of the nonexchanging shareholders in Newton was due to an unlawful use of Corrigan's stock-control of that company; or was the decline and extinction of the Newton Company due to natural competitive causes resulting from the business depression and the outmoded methods employed by the Newton Company or, in other words, the superseding of hand mill operations by the mechanical continuous-mill operations?

If the suit of the plaintiff had been pressed on the original complaint which sought an injunction, could the court have restrained any of the conduct of officers of the Newton Company or the Corrigan Company or the defendant company?

■ The essential facts are not in dispute. The dispute arises over the interpretation of the facts and the purposes deduced from the facts. The plaintiff contends that the Plan of Affiliation and all the negotiations leading up to that Plan, as well as the acts of the majority stockholders and directors subsequent to the Plan, show a design on the part of the directors of the Corrigan and defendant companies to acquire stock-control of Newton and then use of that control to appropriate and acquire the business and assets of Newton.

A careful consideration of all those negotiations, acts, and the Plan, in the light of the circumstances and the conditions of the steel business generally, convinces this court that the intent and the purpose of the parties was to effect economies for the preservation of both Newton's and Corrigan's identity and business. It seems to this court that there was a realization on the part of the officers of both the Corrigan and the Republic Companies that it was to their own best interests to preserve Newton as an outlet for their own steel bars. The various advances of credit and loans, the consignment agreements, and other cooperative efforts, are inconsistent with a desire to wreck or liquidate Newton.

That the affiliation of the business of Newton first with Corrigan and then with Republic was prompted and controlled by economic forces rather than evil or fraudulent intentions is indicated by the significant fact that Corrigan itself succumbed to

those same integrating forces. Corrigan was taken over by Republic as it had taken over Newton.

This little chapter of the history of the steel industry is but a repetition of what has gone on at other times and with other companies. The general record of the steel industry illustrates the observation made frequently by numerous economists that capitalism has itself evolved collective forms which have taken it far beyond the control of individual private investors. The ever-present pressure for curtailment of waste, decrease of overhead, and for the economies which result from coordinated and concentrated operation, have forced companies into various forms of cooperation and centralized control. Both Newton and Corrigan represented steps in a process and the whole process finally became integrated.

The evidence reveals no distinctions or exclusions or oppression against the minority stockholders of Newton. All Newton stockholders were given the same opportunity to exchange their shares for shares of Corrigan. Those who did not wish to exchange were allowed to hold their shares in Newton. If they could have continued to hold such shares, and Newton could have continued to finance its operations, until the steel business expanded to meet the needs of the present war, the determination of the minority stockholders not to exchange Newton stock for Corrigan stock would have been justified. But Newton lacked sufficient financial strength to survive the lean years. It would have been a generous act on the part of Republic to continue to extend credit and carry the financial obligations of Newton until better business conditions obtained, but there was no legal obligation on the part of Republic to do so. It is the opinion of this court that no court would have restrained foreclosure of the mortgage against Newton in view of the circumstances as they existed at that time. The abandonment of the attempt to obtain such an order is an indication that the plaintiff in this case entertained a similar opinion.

If it cannot be said that an injunction would have issued against the conduct of the majority herein complained of, certainly it cannot now be said that the plaintiff is entitled to relief against the results of that conduct. The plaintiff and the other minority stockholders had a choice. They made their election at their peril. After August 15, 1932, it became final or, in any event, it is now too late to change it.

Defendant's motion sustained.