Bloch et al. v. The Baldwin Locomotive Works

*Lindenmuth & Class, Eisman, Lee, Corn, Lewine & Sheftel* and *Robert D. Abrahams,* for plaintiffs.

*Chadwick, Curran, Petrikin & Smithers* and *Morgan, Lewis & Bockius,* for defendant.

TOAL, J., December 7, 1950.—On October 31, 1950, plaintiffs filed a bill of complaint in equity with a motion for a preliminary injunction and rule to show cause attached thereto which was allowed by the court on October 31, 1950, returnable November 17, 1950. The bill was duly served on defendant and in brief avers:

1. Plaintiffs are owners of stock of defendant.

2. Defendant is a Pennsylvania corporation.

3. Defendant mailed a notice on or about October 6, 1950, to common shareholders (notice dated September 28, 1950) in re a special meeting to be held October 25, 1950, at 2 o'clock p.m. (Eastern Standard Time) to act upon:

(a) To amend articles of incorporation to be effective only upon consummation of agreement and plan of reorganization (exhibit A).

(b) To increase authorized number of shares of common stock of the corporation from 3,000,000 shares to 5,000,000 shares and delete from articles mention of 7 percent cumulative preferred stock.

(c) To change the name of the corporation to Baldwin-Lima-Hamilton Corporation.

4. Defendant announced to stockholders in a letter dated September 28, 1950, that "the purpose of the proposed increase in the authorized number of shares of common stock in the company is to enable the company to acquire all of the assets of 'Lima-Hamilton Corporation' in exchange for shares of common stock of 'Baldwin', pursuant to agreement and plan of re-

organization dated as of August 21, 1950", and that this was necessary for "the proposed consolidation of the operation of the company and Lima-Hamilton Corporation".

5. That Lima-Hamilton Corporation (hereinafter called Lima) is a Virginia corporation.

6. That in accordance with the plan of reorganization, the actual issued stock will be increased from 2,373,170 to 4,315,506 shares of common stock of which 1,940,208 shares are to be issued to the stockholders of Lima on a share for share exchange in consideration for the consolidation of Lima and Baldwin, pursuant to the terms of the agreement.

7. Plaintiffs aver agreement and plan of reorganization is in effect a merger and consolidation of Baldwin and Lima in that inter alia:

(a) Lima will be dissolved.

(b) A new corporation with a new name will come into existence.

(c) Two corporations are consolidating their operations and reorganizing and unifying their businesses.

(d) The good will of both companies is to be retained in fact and in name.

(e) The facilities and personnel of the two companies are to be integrated.

(f) The management of the two companies is to be integrated.

(g) Baldwin will assume all of the obligations of Lima.

(h) Stockholders of each corporation will receive an exchange of property for property.

(i) Stockholders of each corporation will receive an exchange of earnings for earnings.

(j) Baldwin will give up a portion of its assets held before reorganization in order to arrive at an equalization of value of the shares of each company on an exchange of shares on a share for share basis.

(k) The new shares to be issued will go directly to the stockholders of Lima and not to Lima-Hamilton Corporation.

(l) Baldwin agrees to qualify to do business in those States in which Lima is now qualified.

(m) The frequently announced statement by Baldwin that the agreement will result in a "consolidated" company.

8. That Baldwin has not proceeded in accordance with the statutes of the Commonwealth of Pennsylvania, particularly with reference to the statutory rights of dissenting stockholders.

9. That each share of common stock of Baldwin now represents ½, 373, 170 of the assets of Baldwin and after the agreement becomes effective will represent ¼, 315, 506 of the assets of Baldwin-Lima-Hamilton Corporation, a new corporation, which differs radically from Baldwin in kind and amount of its capitalization and the nature, amount and extent of its assets and business, and results in the actual loss by Baldwin of its identity, and in effect is a dissolution of Baldwin.

10. Plaintiffs are not willing to exchange their present interest in Baldwin's assets and earnings for holdings in the assets and earnings of Baldwin-Lima Hamilton Corporation.

11. That the value of the common stock of Baldwin is approximately $30 per share and the approximate asset value of each such share is $40.

12. That prior to the special meeting of October 25, 1950, plaintiffs served on Baldwin written objections to:

(a) The proposed consolidation.

(b) The agreement and plan of reorganization.

(c) The actual consolidation and/or merger of Lima with and/or into Baldwin.

The bill of complaint prays:

(a) That the court decree that the proposed consolidation of the operations of the Baldwin Locomotive Works and Lima-Hamilton Corporation and agreement and plan of reorganization between Baldwin and Lima and all acts performed or to be performed thereunder *constitute* an actual and legal consolidation or merger of Lima with, and/or into Baldwin.

(b) That the court by preliminary injunction prohibit and enjoin Baldwin from taking action to put into effect the proposed consolidation or merger unless and until Baldwin shall pay to plaintiffs the fair value of their shares of the common stock of Baldwin.

(c) That the court by preliminary injunction prohibit Baldwin from taking any action concerning the disposition or transfer by Baldwin Locomotive Works to a subsidiary company of stock of Midvale Company and General Steel Castings Company held by Baldwin on December 31, 1949, or net proceeds of any of this stock sold by Baldwin after December 31, 1949, and prior to such transfer, and the net proceeds of the sale by Baldwin of the common stock of Flannery Bolt Company held by Baldwin on December 31, 1949.

Defendant, under Equity Rule 48, has filed two preliminary objections to the bill of complaint. The first objection states:

1. The complaint fails to set forth any cause of action or ground for equitable relief for the reasons as follows:

(a) Defendant is purchasing the assets of Lima-Hamilton Corporation and there will be no consolidation or merger of Lima-Hamilton Corporation with and/or into defendant when the agreement is carried out.

(b) Defendant will not lose its identity or be dissolved when the agreement with Lima-Hamilton Corporation is carried out.

(c) Plaintiffs will continue to be stockholders in defendant when the agreement with Lima-Hamilton Corporation is carried out and are not asked or required to exchange their shares of stock in defendant for stock in any other corporation or corporations.

(d) The facts set forth in the complaint clearly show that plaintiffs are not entitled to recover the fair value of his, her or their shares, or the proportionate part of the net assets of defendant which are represented by his, her or their shares in cash or either of said amounts.

2. The complaint fails to set forth any cause of action or ground for equitable relief for the reason that the relief sought is based on the claim that there will be a consolidation or merger of Lima-Hamilton Corporation with and/or into defendant in spite of the fact that plaintiffs in paragraph 8 of the complaint state that:

"Baldwin has not proceeded in accordance with the statutes of the Commonwealth of Pennsylvania providing for the merger and consolidation of corporations. . . ."

Exception no. 1, although subdivided into four separate paragraphs, may be said to cover one essential point, namely that plaintiffs have not set forth in the bill of complaint sufficient facts, if proven, to sustain plaintiffs' contention that what defendant did or intended to do amounted *in fact* to a merger or consolidation between Baldwin and Lima.

Exception no. 2 states in essence that plaintiffs are not entitled to equitable relief because the relief sought is based on the contention that there will be a consolidation or merger between Baldwin and Lima and yet plaintiffs aver in their bill of complaint that Baldwin is not effecting a statutory merger or consolidation.

The matter has been argued before the court en banc and written briefs have been filed by each side and it is therefore ready for a decision.

It will be noted that plaintiffs are asking for three things in their bill of Complaint:

1. That the court by decree declare the proposed agreement between Baldwin and Lima an actual and legal consolidation or merger.

2. That defendant be prohibited and enjoined from carrying out the terms of the agreement until it shall pay to plaintiffs the fair value of their shares of the common stock of Baldwin.

3. That defendant be enjoined from parting with certain assets to a subsidiary company pursuant to certain of the terms of the agreement.

What plaintiffs actually want may be epitomized as follows:

"Defendant, you are merging with another corporation; we are dissenting shareholders; we want no part in the merger; therefore pay us the fair value of our shares."

What defendant says in answer to the above may be stated in short as follows:

"We are not merging with another corporation, we are merely buying all of the assets of another corporation; if the majority of our shareholders agree to the purchase, you, as dissenting shareholders, are not entitled to receive the fair value of your shares."

Assuming for the moment that what defendant actually is attempting to do is to merge or consolidate with another corporation, what rights do dissenting shareholders have under Pennsylvania law?

The Business Corporation Law of 1933, P. L. 364, 15 PS, §2852-908, provides the following:

"§ 2852-908. RIGHTS OF DISSENTING SHARE-HOLDERS

"A. If any shareholder of a domestic corporation which becomes a party to a plan of merger or consolidation shall file with such corporation, prior to or at the meeting of shareholders at which the plan of merger or consolidation is submitted to a vote, a written objection to such plan of merger or consolidation, and shall not vote in favor thereof, and such shareholder, within twenty days after the merger or consolidation was effected, shall also make written demand on the surviving or new corporation for the payment of the fair value of his shares as of the day prior to the date on which the vote was taken approving the merger or consolidation, without regard to any depreciation or appreciation thereof in consequence of the merger or consolidation, the surviving or new corporation shall pay to such shareholder the fair value of his shares upon surrender of the share certificate or certificates representing his shares. The demand of the shareholder shall state the number and class of the shares owned by him. Unless a shareholder files such written objection and also makes such demand within the twenty-day period he shall be conclusively presumed to have consented to the merger or consolidation, and shall be bound by the terms thereof. If within thirty days after the date on which such merger or consolidation was effected the value of such shares shall be agreed upon between the dissenting shareholder and the surviving or new corporation, payment thereof shall be made in cash within ninety days after the date on which such merger or consolidation was effected, upon the surrender of the share certificate or certificates representing his shares. Upon payment of the agreed value, the dissenting shareholder shall cease to have any interest in such shares or in the corporation.

"B. If within such period of thirty days the shareholder and the surviving or new corporation do not so agree, then the dissenting shareholder may, within sixty days after the expiration of the thirty-day period, apply, by petition to the court of common pleas, in equity, within the county in which the registered office of the surviving or new corporation is situated, if it be a domestic corporation, or, if it be a foreign corporation, to the court of common pleas, in equity, within the county in which was situated the registered office of the corporation of which such petitioner was a shareholder, which shall be deemed to be the county in which the cause of action of such petitioner arose, and all process in such proceeding shall be served upon the surviving or new foreign corporation as provided in section one thousand eleven of this act, for the appointment by the court of three disinterested persons to appraise the fair value of his shares without regard to any depreciation or appreciation thereof in consequence of the merger or consolidation. The award of the appraisers, or of a majority of them, shall be submitted to the court for determination, and the judgment of the court thereon shall be final and conclusive. The costs of such appraisal, including a reasonable fee to the appraisers, shall be fixed by the court, and shall be borne by the surviving or new corporation unless, in the opinion of the court, the action of any shareholder in refusing the offer of the corporation has been arbitrary, vexatious, or in bad faith, in which case the costs shall be assessed in the discretion of the court. The award shall be payable only upon, and simultaneously with, the surrender to the surviving or new corporation of the share certificate or certificates representing the shares of the dissenting shareholder. If the award shall not be paid by the surviving or new corporation within thirty

days after the order of the court thereon, the amount of the award shall be a judgment against the surviving or new corporation, as the case may be, and may be collected as other judgments in such court are by law collectible. Upon the payment of the award or judgment, the dissenting shareholder shall cease to have any interest in such shares or in the surviving or new corporation. Such shares may be held and disposed of by the surviving or new corporation as it may see fit. Unless the dissenting shareholder shall file a petition within the time herein limited, such shareholder and all persons claiming under him shall be conclusively presumed to have approved and ratified the merger or consolidation, and shall be bound by the terms thereof.

"C. The rights and remedies at law or in equity of any shareholder who desires to object to, or to dissent from, any merger or consolidation shall be limited to those prescribed under this section, and such rights and remedies under this section shall be exclusive.

"D. A copy of this section 908 shall be enclosed with the written notice mentioned in clause B of section 902 of this act, and said written notice shall state that said section 908 sets forth the exclusive rights and remedies of shareholders who object to the plan of merger or plan of consolidation."

It appears from the above that dissenting shareholders to a merger have but one remedy, as set forth in the statute, and that is to receive in exchange for their shares the fair value thereof. This court has no jurisdiction to enjoin defendant from proceeding with the agreement between itself and Lima. However, the court may assume jurisdiction to determine from the facts of the case whether the transaction before it is merely a purchase by one corporation of the entire assets of another corporation or whether it actually

*in fact* is a merger or consolidation. Under the provisions of the "Business Corporation Law", supra, a statutory merger becomes effective "Upon the approval of the articles of merger—by the Department of State": 15 PS §2852-906. The dissenting shareholder is required to "make written demand—for the payment of the fair value of his shares—*within twenty days after the merger or consolidation was effected*": 15 PS §2852-908. In the case at bar defendant never intended to submit articles of merger to the Department of State for approval, because defendant has not brought itself within the terms of the statute. Therefore, the dissenting shareholder stands helpless to protect his rights unless and until some way is found to determine whether a merger is *in fact* taking place. The court of equity has been given the statutory authority and responsibility under the "Business Corporation Law", supra, to determine finally, the fair value of a dissenting shareholder's shares of stock. We see no reason, therefore, why equity should not also have authority to determine whether or not a merger has *in fact* taken place, where the statute is not followed by the corporations involved.

In the case of Lauman v. The Lebanon Valley R. R. Company, 30 Pa. 42 (1858) a dissenting shareholder brought an action to restrain a corporation from merging with another corporation, under provisions of a special act of the General Assembly passed May 5, 1857. This case arose before the statute law declared what rights a dissenting shareholder had under the circumstances. The court ruled that the dissenting shareholder had no right to stop the merger, but that he could not be compelled to go along with the merger. The chancellor let the injunction be issued on plaintiff's giving security to the amount of $1,000 to defendant; and let it be dissolved on defendant's giving

security to plaintiff in double the market value of his stock, to pay for the stock when its value shall be ascertained. The ruling in the above cited case undoubtedly was a guide-post to the legislature which, at a later date, wrote into the statute law essentially the findings of the court, defining the rights of a dissenting shareholder to a merger.

From the facts as pleaded in the bill of complaint, taken as proved, what is Baldwin actually doing or attempting to do under the terms of the agreement? We find the following as facts:

1. Two corporations of approximately equal size are uniting.

2. Baldwin's certificate of incorporation is being changed.

3. Baldwin's letter and proxy statement repeatedly refer to "consolidation"; and the agreement is called "Agreement and plan of reorganization"; the purpose of the agreement is said to be to "unite" the corporations.

4. The name of the united company is to be "Baldwin-Lima-Hamilton".

5. The future management of the "consolidated company" will include the top executive personnel of Lima, plus "several other members of the present Lima Board of Directors".

6. The agreement expressly provides that Baldwin will assume all of Lima's liabilities except expenses of the reorganization and obligations to dissenting stockholders.

7. The agreement provides that prior to the closing Baldwin must qualify to do business in those States where it may be required because of Baldwin's acquisition of Lima's assets and business.

8. The agreement provides that, after the closing, Lima will effect its dissolution.

9. The agreement provides that Baldwin shall make partial distribution to its shareholders of some of its assets before the closing in order that the assets of both Baldwin and Lima might approach equal value. This explanation is given by Baldwin "In discussing the relative values of Baldwin and Lima, both parties realized that Baldwin's book value per share was higher . . . it would first be necessary if a share for share exchange were to be made, to distribute these assets . . . to Baldwin stockholders prior to such exchange. . . ."

10. The use of the phrase ". . . share for share exchange . . ." shows the intent of the parties was and is to merge or consolidate. On a simple sale, the consideration goes to the seller (Lima). On a merger or consolidation, there is an exchange of shares.

In the case of Lauman v. The Lebanon Valley R. R. Company, supra, the Supreme Court clearly marked out the distinction between an ordinary purchase of assets and a merger, by cataloguing the distinctive attributes of a merger. This case set the pattern of Pennsylvania law as to mergers and consolidations. In 1947 the Pennsylvania Supreme Court called it "a well considered opinion": Weisbecker v. Hosiery Patents, Inc., et al., 356 Pa. 244 at 253. The importance of the case lies in the court's stress on the *actualities* of the situation as distinguished from the *legal fictions* in which they are clothed. We quote from page 45 of the opinion:

"No one will deny that an association of individuals becomes a corporation, when, by authority of law, it acquires a name by which its *legal* identity can be preserved through all the changes of membership, business, constitution, and sphere of action which it may undergo, and which may entirely destroy its *actual* identity. *Such* a name is essential to corporate ex-

istence, and when it is given up, the corporation ceases to exist.

"Bearing in mind these propositions, let us inquire what will be the effects of this consolidation of these two companies, as authorized and proposed.

"1. The Reading company will extend its chartered rights, privileges, and duties from Reading to Harrisburg, while still preserving its name, and therefore its legal though not its actual identity.

"2. The Lebanon company, that is, all its members, will pass into the Reading Company, and become members thereof, and all their corporate privileges and property will become vested therein, and, by authority of law, all the liabilities of the former company will become chargeable against the latter.

"3. By such an act the Lebanon company loses its actual identity, abandons its name, and therefore its legal identity and its corporate existence, and can no longer claim any legal recognition. This is called a merger of the Lebanon corporation into the other; but such a merger is a dissolution, destroying the actual identity of both, while the legal identity of one of them is preserved. As where a life estate is merged in a fee simple, one being destroyed and the other enlarged by the operation."

Applying the above reasoning to the case at bar we may ask the following questions:

1. Is Lima's actual corporate personality drawn into "Baldwin-Lima-Hamilton Corporation", or is it left apart?

2. Are the fundamental relations between Baldwin and its stockholders, and between those stockholders among themselves, changed, or are they left virtually unchanged?

3. Is Baldwin's actual corporate character so changed that, although its *legal* identity may be retained, nevertheless it loses its *actual* identity?

If the answer to question no. 1 is that the actual corporate personality of Lima is drawn into "Baldwin-Lima-Hamilton Corporation"; and to question no. 2, that the fundamental relations between Baldwin and its stockholders, etc., are changed; and to question no. 3, that Baldwin's actual corporate character is so changed, that although, its *legal identity* may be retained, it loses its *actual identity*, then this court must find that these two corporations are in fact merging or consolidating and not merely effecting a sale of the entire assets of one corporation to another.

See Appeal of Fame and Western Hose Co. (1874), 6 Leg. Gaz. 79 (Pa. Supreme Ct.); Merwine v. Mt. Pocono Light & Improvement Co. (1931), 304 Pa. 517, 524; Ferrando v. U. S. Ntl. Bld. & Ln. Assoc. (1932), 307 Pa. 25; Commonwealth v. Merchants National Bank of Allentown (1936), 323 Pa. 145; Metropolitan Edison Co. v. Commissioner of Internal Revenue, C. C. A. 3rd (1938), 98 F.(2d) 807; Helvering v. Metropolitan Edison Co. (1939), 306 U. S. 522 (Roberts, J.); Weisbecker v. Hosiery Patents, Inc., et al. (1947), 356 Pa. 244, 252.

Defendant in its brief stresses the point that there can be no *de facto* merger unless there could in the first instance be a *de jure* merger. It states that (Baldwin) a Pennsylvania corporation, could not legally merge with (Lima), a Virginia corporation. It seems logical and plausible that if a thing cannot exist *under the law*, then it cannot be said to exist *in fact*. Let us examine into the statutory law of both Pennsylvania and Virginia to learn if defendant's contention has any validity.

The Pennsylvania statute (Business Corporation Law), supra, 15 PS §2852-901, states the following:

"A. Any two or more domestic business corporations : . . and any one or more foreign business corpora-

tions, may, in the manner hereinafter provided in this article, be merged into one of such domestic business corporations, hereinafter designated as the surviving corporation, or consolidated into a new corporation to be formed under this act, provided such foreign business corporations are authorized by the law or laws of the jurisdiction under which they were formed to effect such merger or consolidation.

"B. Any one or more domestic business corporations, and any one or more foreign business corporations, may, in the manner hereinafter provided in this act, be merged into one of such foreign business corporations, hereinafter designated as the surviving corporation, or consolidated into a new corporation to be formed under the law or laws of the jurisdiction under which one of the foreign business corporations was formed, provided the laws of such jurisdiction authorize such merger or consolidation."

The Virginia General Corporation Law, Code of Virginia, 1950, §§13-40 and 13-41, states the following:

## "CHAPTER 5
## "MERGER AND CONSOLIDATION

"§13-40. GENERAL AUTHORITY TO MERGE OR CONSOLIDATE.—Except as any merger or consolidation is prohibited by §§56-49 or 56-345, any corporation not under patronage or control of the State, organized or to be organized under any law or laws of this State, whether it be a corporation having capital stock or a non-stock corporation (other than a non-stock corporation organized for social purposes only), may merge or consolidate in the manner prescribed in §13-43 of this Code into a single corporation with any other corporation organized for the purpose of carrying on the same or a similar business or for the same or similar purposes under the laws of this or any other State of the United States, or under the laws of

the United States; and a corporation organized for social purposes only may merge or consolidate in the same manner, except that the merger or consolidation of such corporations shall be by unanimous vote of the members by whatever name called having voting power at a meeting legally called for the purpose of considering and voting in person or by proxy on an agreement for merger or consolidation. (Code 1919, §3821; 1944, p. 7.)

"§13-41. EFFECT OF MERGER OR CONSOLIDATION.—Any such merged or consolidated corporation shall, upon the payment of a proper charter fee, thereby become a domestic corporation of this State and be subject to its laws, and to the jurisdiction of its courts, and may be either one of the merging or consolidating corporations, or a new corporation to be formed by means of the merger or consolidation; and by virtue of this chapter, and the proceedings had pursuant thereto, the corporations shall be consolidated and merged, so that all property, rights, franchises, and privileges by law vested in each corporation so merged or consolidated shall be transferred to and vested in the corporation formed by the merger or consolidation." (Code 1919, §3821; 1914, p. 7.)

We find, from the above, that Pennsylvania permits the merger under the law and also that Virginia permits the merger under the law and provides that "any such merged or consolidated corporation shall, upon the payment of a proper charter fee, thereby become a domestic corporation of this State and be subject to its laws. . . ."

Defendant says that because "Baldwin" did not desire to become a Virginia corporation, it could not lawfully merge with "Lima". This court is not concerned with the desires or special whims of the "Baldwin" management; however, we note that under the terms of the agreement, "Baldwin" agrees to qualify to do busi-

ness in those States in which "Lima" is now qualified. It seems, therefore, that even under the terms of the agreement "Baldwin" is not particularly concerned or frightened about crossing State lines and becoming acclimated to the regulations and laws of foreign jurisdictions.

The contention of defendant in the case at bar was specifically made by defendant in Commonwealth v. Merchants National Bank of Allentown, 323 Pa. 145, and the Supreme Court ruled against such contention. In this case a trust company, a Pennsylvania corporation, merged with a National bank, under a Federal act permitting such a merger. However, the law of Pennsylvania did not permit a Pennsylvania trust company to merge into or consolidate with a National bank. Defendant National bank, after the merger, was sued on a claim of indebtedness which existed against the trust company before the joinder of the two banks and it defended on the ground that as Pennsylvania law did not permit a merger there was no *de facto* merger. The Supreme Court brushed this contention aside and pointed out that all that was necessary to make the merger legal in Pennsylvania was for the trust company to first change its charter to that of a National bank and, then merge under the Act of Congress with the other National bank. Just as the trust company could have become a National bank, so "Baldwin" *could* domesticate itself in Virginia.

"Baldwin" here contends for the *forbidden* rule that, because it failed to follow the procedures of the statute governing corporate mergers, the property of "Lima" and "Baldwin" may be united and "Baldwin" may repudiate its lawful obligations to its stockholders. This court is of the opinion that plaintiffs have pleaded sufficient facts, which if proven, would make out a case of merger or consolidation and not a case of merely

one corporation purchasing the entire assets of the other corporation. Accordingly, the preliminary objections filed by defendant must be dismissed.

Defendant in its brief has stated that "no decision in Pennsylvania has been found which considers the precise question raised by plaintiffs but the decisions in other jurisdictions involving similar questions support the conclusion that the transaction here involved constitutes a purchase by 'Baldwin' of the assets and business of 'Lima' and is neither a statutory merger nor a consolidation".

We have carefully read and analyzed the cases cited by defendant in support of this contention, and are unable to agree with defendant's conclusion as to their effect upon this case. In Moy, Executrix, v. Colonial Finance Corporation, 283 Pa. 323, defendant corporation, under an agreement, purchased all the property of the Republic Finance Corporation and agreed to assume all the outstanding liabilities. The consideration was two shares of defendant for three shares of Republic. Plaintiff's decedent refused to exchange his preferred stock in Republic and instituted suit against defendant for the par value of his preferred stock contending that such stock was a liability assumed by defendant under the agreement. In this case plaintiff took no steps to prevent or annul the transfer and practically the only question in the case was whether a holder of preferred stock is a creditor of a corporation. This case is of no value to the determination of the issue before us as the main issue did not involve the existence of a merger. Furthermore, in the present case we have many more factors present such as change of name, authorization of additional capital stock, integration of personnel, dissolution of "Lima" agreed upon before the actual transfer of properties, and many others heretofore mentioned.

In Mitchell Inv. Co. v. Republic Steel Corp., 63 F. Supp. 323, Republic, which was a creditor of Newton Company, ultimately obtained all the property of the Newton Company through foreclosure and purchase but the identity of the separate corporations remained. This is not present in the case before us as "Lima" will be dissolved according to the agreement. Furthermore, plaintiff in the Republic case admitted that it was not a complete and technical merger.

Argenbright et al. v. Phoenix Finance Co. of Iowa, 21 Del. Ch. 288, 187 Atl. 124 (1936), does not contain the numerous circumstances present and pleaded in the present case. Furthermore, in that case complainants never expressed a dissent until three years after the event (purchase of assets) took place. The court pointed out that the main contention of complainant was that if a sale of assets is made in consideration of stock or securities of the purchasing corporation, a merger or consolidation results. We could not agree with such a contention, if it were presented in this present case but plaintiffs have gone far beyond that proposition. We must hear and analyze all the circumstances involved and if a merger or consolidation in effect arises, even though defendant has proceeded by other means and labeled the entire transaction with a different name, thereby depriving its dissenting shareholders from their rights, we feel compelled to protect the dissentors and to guarantee them the remedy to which they are entitled.

Accordingly, the court makes the following

### Order

And now, to wit, December 7, 1950, it is ordered and decreed as follows:

1. That the preliminary objections made by defendant to plaintiffs' bill of complaint in equity be and the same are hereby dismissed.

44

2. Defendant is herewith granted leave to file an answer to the bill of complaint in equity within 20 days from the filing of this order.